Hely, J.
I. INTRODUCTION
The plaintiffs wife was killed in a two-vehicle accident involving her car and a pickup truck driven by an intoxicated driver. In this action under G.L.c. 93A, §9, the plaintiff is entitled to recover damages from the other driver’s motor vehicle liability insurer because the insurer violated G.L.c. 176D, §3(9)(f). The defendant insurer failed to make a fair settlement offer after the pickup driver’s liability had become reasonably clear. The plaintiff is entitled to actual damages in the amount of $25,417, plus his reasonable attorney fees and costs for the Chapter 93A claim. Multiple damages are not warranted because there was no willful or knowing violation.
The case was tried before the court without a jury. The court’s findings are based on the more credible evidence and the reasonable inferences that the court has drawn from the evidence.
II. REASONABLY CLEAR LIABILITY
On April 5, 1997, at about 6:51 p.m., Dolores Lane and Robert B. Senior were in a two-vehicle accident in Plymouth. Mr. Senior was driving west on Route 44 in a pickup truck. Route 44 in this area has two westbound lanes and two eastbound lanes with no barrier between the westbound and eastbound lanes.
Mrs. Lane was driving a Ford Tempo. The front of Mr. Senior’s truck crashed into the driver’s door of Mrs. Lane’s car. Mrs. Lane was entering Route 44 from Pilgrim Trail, a small side street leading out of a mobile home park. After stopping at the stop sign at the end of Pilgrim Trail, Mrs. Lane was attempting to cross the two westbound lanes of Route 44 and make a left turn into the eastbound lanes.
Mrs. Lane was employed as a visiting nurse. She had been visiting an elderly client in the mobile home park.
Mr. Senior was operating under the influence of alcohol and speeding at the time of the accident. His headlights were on. Mrs. Lane had on her parking lights but not her headlights. Mrs. Lane sustained multiple injuries and showed no vital signs after the crash. She was pronounced dead upon her arrival at the hospital.[1]
Mr. Senior had a motor vehicle insurance policy with Commerce Insurance Co. with bodily injuiy liability coverage up to a limit of $100,000. Within a few days of the accident, Attorney Gerard F. Lane, Mrs. Lane’s brother-in-law, agreed to represent her family regarding their claims arising from the accident. After some telephone discussions with Commerce representatives, Mr. Lane sent an April 23, 1997, letter to Commerce. This letter asked Commerce whether they would pay the $100,000 limit and, if not, how much would they pay in settlement of the Lane family’s wrongful death claim. Commerce replied that they needed to fully investigate the case, and they made no settlement offer at that time. On June 17, 1997, Attorney Lane filed in Superior Court a wrongful death action against Mr. Senior. The plaintiff was Eugene T. Lane, Mrs. Lane’s husband and the executor of her estate.
Commerce performed a prompt and thorough investigation of the claim. Their investigation began in April 1997, as soon as they learned of the accident involving their insured. The investigation made it reasonably clear that a fair settlement of the claim would require payment of the $100,000 policy amount. The problem is that Commerce failed to offer the policy amount promptly after it became reasonably clear that this amount would be necessary for a fair settlement. Commerce did not offer the $100,000 policy amount to the Lane family until January 14, 1999. Commerce waited until after Mr. Senior was convicted in Superior Court on his indictments for motor vehicle homicide, operating under the influence and operating to endanger based on the accident with Mrs. Lane. This delay in offering the policy amount was an unfair claim settlement practice in violation of G.L.c. 176D, §3(9)(f), and G.L.c. 93A, §2.
The wrongful death damages of Mrs. Lane’s family substantially exceeded $200,000. Even if negligence by Mrs. Lane had been as much as fifty percent of the cause of the accident, a fair settlement would still have required an offer of the $100,000 limit. This was reasonably clear by July 31, 1997. Commerce’s argu *297 ment at the trial properly recognized that any damages award would exceed the policy limit, even with a maximum fifty percent reduction of damages based on comparative negligence. Commerce’s trial argument concentrated on the basic comparative negligence liability issue, not on the amount of damages. Commerce argued that basic liability did not become reasonably clear until much later.
The court finds that liability for the policy amount became reasonably clear by July 31, 1997. It was reasonably clear that a trial jury would find that comparative negligence by Mrs. Lane was less of a cause of the accident than the negligence of the intoxicated Mr. Senior. Based on the information that Commerce had, this was reasonably clear by July 31,1997. Some of the more important evidence items that Commerce had by this date are summarized below.
III. IMPORTANT ASPECTS OF THE EVIDENCE KNOWN TO COMMERCE BY THE END OF JULY
A. Police Reports: Observations and Arrest of Robert Senior
Within a week or two of the accident, Commerce had obtained the Plymouth Police reports. The Plymouth Police officers concluded that Mr. Senior was intoxicated or at least operating under the influence, and they so charged him.
Mr. Senior was arrested at the scene on April 5 for operating under the influence and motor vehicle homicide by operating under the influence. The arresting officer, Officer Kevin J. Furtado, reported that he had a strong odor of liquor on his breath, slurred speech and glassy eyes. He was unsteady on his feet. Officer Furtado reported that Mr. Senior spoke very softly and was very hard to understand as he would always turn his head away when the officer asked him about the accident.
Mr. Senior failed field sobriety tests at the scene. He could not recite the alphabet past the letter L. He was unsteady on his feet. He could not perform the heel-to-toe walk on a ten-inch wide, painted white line. He strayed off the line several times. Officer Furtado formed the opinion at the scene that Mr. Senior was under the influence of alcohol.
A second officer, Clifton Brant III, observed Mr. Senior stepping off the painted line three times during the field sobriety tests. Officer Stephen A. Viella also observed that Mr. Senior had slurred speech and a strong odor of an alcoholic beverage emitting form his person.
At 7:40 p.m., Mr. Senior was booked at the Plymouth Police station by Lieutenant Arthur W. Budge, Jr. Mr. Senior refused to take a breathalyzer test. Lieutenant Budge observed that Mr. Senior had a flushed face, slurred speech and a strong odor of alcohol on his breath. Mr. Senior was unsteady on his feet at the police station. Lieutenant Budge also noted that Mr. Senior’s eyes were watery, bloodshot and glassy. Lieutenant Budge’s opinion was that Mr. Senior was intoxicated, and he included this in his report.[2]
B. Beth Forst and Diana Keating
The police reports contained statements from Beth Forst and Diana Keating, two witnesses who observed crucial events at the scene at the time of the accident. Mrs. Forst was driving east on Route 44 approaching Pilgrim Trail. She noticed Mrs. Lane’s car edging out of Pilgrim Trail, stopping, rolling slightly, stopping, rolling slightly and stopping. Mrs. Lane’s car had only its parking lights on. Mrs. Forst continued east and saw the defendant’s truck traveling west on Route 44 “very fast” at a speed she estimated to be fifty or fifty-five m.p.h. She thought they would crash and they did. She heard the crash but did not see it. She felt her own car shudder when she heard the crash. She immediately called the police on her cell phone.
Commerce adjuster Cheiyl DeMelo took a recorded statement from Beth Forst on April 14, 1997. This statement was basically consistent with her statement to the police, but she added some important details. Mrs. Forst stated that Mrs. Lane’s car did not have a directional signal on and she did not know if she was going to go east or west. As she went by Mrs. Lane’s car at Pilgrim Trail she looked at her mirror and screamed, “put your lights on, put your lights on.” She said that Mrs. Lane was edging out and edging out and then proceeded “to come out into the lane.” Mrs. Forst slowed down and noticed the Senior vehicle. She said he “flew right by me,” “whipped right by me.” She stated that he was “at least doing 50 to 55 mph.” Mrs. Forst said that Mr. Senior was in the right travel lane heading west. When she looked again in her mirror she could see that they had collided. She said that there was no squealing of wheels. When she looked back there were no brake lights on.
Mrs. Forst’s statement to Ms. DeMelo described the lighting conditions as “very dim,” “pitch black,” and “very, very dark.” The road was dry.[3]
Diana Keating reported to the police that just before the accident she stopped at Mark Drive, just southeast of the collision point on Route 44. She intended to attend to her own flat tire. She heard the crash. She looked up and saw Mrs. Lane bounce up and down in her seat. She ran to Mrs. Lane and gave her first aid. She detected no vital signs. Mrs. Keating was performing CPR on Mrs. Lane when EMTs arrived.
Mrs. Keating gave a recorded statement to Commerce adjuster Louis Sroczenski on June 27, 1997. Mrs. Keating said that it was “just before dusk” at the time of the accident and “still light but people were putting on their headlights.” This contradicted Mrs. Forst on the lighting and strengthened the liability case against Mr. Senior. When asked about skidmarks, she said it was dark by that time.
Mrs. Keating said she was about one hundred feet from the accident site. Mrs. Keating stated that she *298 heard a bang and saw the impact of the front of the truck into the driver’s door. Mrs. Keating estimated the truck’s speed before the accident at forty-five m.p.h.
Mrs. Keating stated that she did not know exactly but she thought that the majority of Mrs. Lane’s car was in the right westbound lane. She said that it may have been pushed more toward the middle and into both westbound lanes in the impact.
After the collision, Mrs. Keating checked on Mr. Senior. He said he thought he was okay, but he had a bang on his chin. He seemed “stable” to Mrs. Keating. Mrs. Lane was in her car with her seat belt on. The bottom part of her body was on the driver’s side and the top half was pushed over toward the passenger side with her head kind of over the headrest. Mrs. Keating was trained in CPR and respiratory therapy. She observed no vital signs when she tried to aid Mrs. Lane. Mrs. Keating thought Mrs. Lane was dead upon the impact.
Mrs. Keating stated that at the scene Mr. Senior said to her, “I killed her,” or “I think I killed her,” or “did I kill her?” Mrs. Keating did not smell any alcohol on either Mr. Senior or Mrs. Lane. She described Mr. Senior’s condition as “in a state of shock because he hit his head” and “amazed at what had happened.”
C.Mr. Senior’s Statements to the Police
At the scene, Mr. Senior told Officer Viella in slurred speech that he was driving the truck and, “I was driving west when this car pulled out in front of me.”
Mr. Senior told Officer Furtado that he had had a couple of beers about an hour earlier. When the officer asked where, Mr. Senior would not answer. Officer Furtado told Mr. Senior he could smell alcohol on his breath. Mr. Senior then turned his head away when the officer asked further questions. Mr. Senior said he was going the speed limit. When the officer asked him what the speed limit was, he did not know. Officer Furtado reported that the posted speed limit for this part of the road is forty-five m.p.h.
Mr. Senior told Officer Furtado that he did not see the vehicle that came out of Pilgrim Trail. He repeated that he just did not see the vehicle that he struck. Mr. Senior said that his own headlights were on.
During the booking, Mr. Senior told Lieutenant Budge that he had had “a few beers.” He said he did not want to say anything more until he spoke with an attorney.
D.Accident Scene and Vehicles
The accident occurred at about 6:51 p.m., the time of Mrs. Forst’s cell phone call to the police. Sunset was at 6:15 p.m. The road conditions were diy.
The end of Pilgrim Trail where it meets Route 44 was fairly well lit by a street light on the north edge of Route 44, twenty-five feet east of the east edge of Pilgrim Trail. Two globe lights on short pillars marked the entrance to Pilgrim Trail. The globe lights made some contribution to the artificial lighting.
According to Officer Furtado’s report, following the collision Mr. Senior’s truck came to a rest in the left of the two westbound lanes on Route 44. Mrs. Lane’s Tempo was facing south in the same westbound lane. The pickup had a plow mount on the front. The plow mount and the front center of Mr. Senior’s truck crashed into the driver’s door of Mrs. Lane’s Tempo. Officer O’Hara reported that the truck’s plow mount had “physically passed through the drivers side door of the Tempo and was partially within the drivers compartment of the Tempo.” The two vehicles were still impacted together after they came to rest.
According to the parties’ stipulation, the police reports stated that Mr. Senior’s truck pushed Mrs. Lane’s Tempo fifty-one feet from the point of impact. There was a skidmark ending at one of the truck’s rear tires at its point of rest. The skidmark was forty feet and five inches long. The truck’s skidmark thus did not begin until after the point of impact.
Mr. Senior was traveling on a slight upgrade on Route 44 as he approached the intersection. Apart from the lighting issue, there was along, unobstructed view of the Route 44 westbound lanes for both Mrs. Lane as she exited Pilgrim Trail and for Mr. Senior as he approached the intersection.
E.Mr. Senior’s Blood Alcohol Level
Mr. Senior was released from Plymouth Police custody shortly before 11.30 p.m on the night of the accident. He went to Jordan Hospital and had a blood tested at his own request. This blood test showed that his blood alcohol level at 11:30 p.m. was .091. Four and a half hours after the accident, Mr. Senior’s blood alcohol was above the amount that would permit an inference that he was under the influence of alcohol. G.L.c. 90, §24. The parties stipulated that Commerce knew of this blood alcohol level within one week of the accident. Commerce learned of this from the office of Jack Atwood, Mr. Senior’s criminal defense attorney.
It is common knowledge that a driver with a blood alcohol level of .091 at 11:30 p.m. and who did no drinking after the accident must have had a much higher blood alcohol level four and a half hours earlier at the time of the accident. With or without a toxicology expert, Commerce reasonably should have known from the blood alcohol test and the police report observations that Mr. Senior was intoxicated well beyond the level of “under the influence” at the time of the accident.[4]
The blood alcohol test along with the police observations of Mr. Senior at the scene and at the station prevent any reasonable reliance on Mrs. Keating’s failure to notice an odor of alcohol while she provided emergency aid to Mr. Senior and Mrs. Lane. Similarly, the self-serving statements of the waitress and Mr. Senior’s drinking companion that he did not seem *299 intoxicated would have little objective weight in the face of the blood alcohol test and the police officers’ observations at the scene and at the booking.
F. Court Action
As noted earlier, Attorney Lane filed the plaintiffs wrongful death suit against Mr. Senior on June 17, 1997.[5] Attorney Lane moved for a real estate attachment against Mr. Senior. OnJune25,1997, aSuperior Court judge granted a real estate attachment against Mr. Senior in the amount of $500,000. Commerce thus knew by July that after a contested preliminary hearing the court had determined that the plaintiff had a likelihood of success, despite the comparative negligence issue. Commerce also knew that the judge viewed the likely damages to be at least $500,000.
Commerce received another piece of court news in June or July. On June 17, Mr. Senior was indicted by a grand jury for motor vehicle homicide, operating under the influence, and operating to endanger in the accident with Mrs. Lane. This was a formal determination by the grand jury and by the District Attorney’s Office that there was probable cause to support the charges. This confirmed the original arrest determination by the Plymouth Police Department.
Attorney Atwood sent Commerce the grand jury transcript and autopsy report on July 24, 1997.
G. Accident Reconstruction Report
Commerce decided to hire Northeast Collision Analyses, Inc., to do an accident reconstruction report regarding this case. The Northeast report was completed on July 10, 1997, and received by Commerce by a few days later. Relying on the police reports, the Northeast report stated that the collision occurred entirely in the left westbound lane of Route 44 as Mr. Senior was traveling west in that lane. The Northeast report gave an opinion that Mr. Senior’s truck was going approximately foriy-five m.p.h. prior to the collision. Making a series of additional assumptions, the Northeast report stated an opinion that Mr. Senior’s truck was about 141 feet away from the Tempo at the beginning of perception and reaction and that this was beyond the point of no escape. The point of no escape was defined as the place and time beyond which the collision cannot be avoided.[6]
By the end of July Commerce’s investigation file was quite extensive. With the receipt of the grand jury transcript and the accident reconstruction report, Commerce had everything it could reasonably expect in the way of a complete investigation.
IV. FURTHER FINDINGS ON THE TIMING OF A PROMPT, FAIR SETTLEMENT OFFER
As long as they acted promptly, it was reasonable for Commerce to obtain a reconstruction analysis by an engineering firm before offering the policy amount. In general, four months (AprilJuly) is not an unreasonably long time to offer a fair policy limit settlement in a death case. It was not an excessive time in this case. There was powerful liability evidence against the insured, Mr. Senior, but there was also evidence of some comparative negligence by Mrs. Lane, particularly regarding the darkness, her unlit headlights and her pulling out across the two westbound lanes of Route 44 with Mr. Senior approaching.
An insurer must be given reasonable latitude to fully investigate a serious case before offering the policy limit. The police reports stated that a State Police expert, Trooper Pina, would be doing an accident reconstruction report. Trooper Pina’s report was either not completed or not made available to Commerce by July. In these circumstances it was reasonable for Commerce to obtain its own accident reconstruction report as part of a complete investigation. The plaintiffs insurance expert, Robert Hall, was not convincing when he dismissed the need for this step in the insurer’s investigation.
By the end of July, however, there was nothing left to reasonably wait for. Commerce received the Northeast report in mid-July and the grand juiy transcript in late July. Attorney Atwood had told Commerce early on that “Mr. Senior will exercise his right of silence until the completion of his trial, criminal proceedings and/or exposure to incarceration.” Ex. 2, p. 65.
A criminal conviction would dispel any reasonable doubt about Mr. Senior’s civil liability. G.L.c. 176D, §3 (9)(f), however, imposes a fairly strict standard on a liability insurer. Under this statute, the insurer had a duty to make a “prompt” offer of a fair and equitable settlement once “liability has become reasonably clear.” The “reasonably clear” standard requires the settlement offer when liability becomes objectively clear, not when liability becomes certain. See Bobick v. U.S. Fidelity & Guaranty Insurance Co., 57 Mass.App.Ct. 1, 7 n. 6 (2003); Demeo v. State Farm Mutual Auto Insurance Co., 38 Mass.App.Ct. 955, 955-56 (1995). Liability may be reasonably clear even though some triable liability issue may remain. This is an objective test. Id. A violation of G.L.c. 176D, §3 (9)(f) does not require a finding of bad faith.
Another way of stating the Chapter 176D issue is: was it reasonably clear that a reasonable trial jury would find Mr. Senior liable? Commerce had all the information it needed to answer this question by mid-July.
Once a thorough investigation had been completed (in this case by mid-July), the insurer had a duty to objectively assess whether liability was reasonably clear. It would be reasonable to also allow Commerce until the end of July, but not longer, to review and analyze the full investigation and to decide to offer the policy amount.
What about the comparative negligence evidence? The obj ectively reasonable answer is that it would have been overpowered in the eyes of a reasonable jury by *300 the evidence of Mr. Senior’s intoxication, his speeding, and his failure to recognize the danger and to stop or take evasive action. The high level of Mr. Senior’s intoxication, as documented by the hospital blood test, would have had great weight with a reasonable jury. He drove his truck while in a physical condition that impaired his perception, judgment, reaction time and driving skills. Mr. Senior’s intoxication substantially reduced his ability to recognize the danger presented by Mrs. Lane’s Tempo. His intoxication cut down the opportunities for stopping or avoiding the collision.
A pickup has a greater mass and a lesser maneuverability than an ordinary car. These factors decreased the stopping and avoidance capabilities and increased the risk of severe injury to someone struck. Mr. Senior disregarded these problems when drove his pickup in an intoxicated condition. He made things worse by excessive speed. Jurors readily understand the compounding effects of intoxication. Commerce should have understood them as well.
There was unquestionably some degree of comparative negligence by Mrs. Lane in not having her headlights on and in pulling out across the westbound lanes with Mr. Senior approaching. See G.L.c. 89, §9. But in a comparison with an intoxicated and speeding pickup driver, a jury would be highly unlikely to find that she was more than fifty percent of the cause of her own death.
The Commerce claims people handling this case and the attorneys they consulted were competent and experienced professionals. They acted with good faith and with sound and careful procedures. Commerce did have some chance of obtaining a favorable liability verdict, but it was a longshot. By the end of July the Commerce professionals should have recognized that it was a longshot. An ordinary defendant in a civil case has the right to holdout and take a longshot case to trial. The Legislature, however, has imposed a special duty on insurance companies. The “reasonably clear” liability standard of G.L.c. 176D, §3(9)(f), required Commerce to make a “prompt” offer of a fair settlement as soon as a complete investigation showed a reasonably clear likelihood that Mrs. Lane’s negligence would not exceed that of the intoxicated Mr. Senior. That point was reached by the end of July 1997.
Commerce did not offer the $100,000 policy amount to the Lane family until January 14, 1999, after Mr. Senior was convicted in Superior Court on the motor vehicle homicide indictment.[7] The failure to offer the policy amount between July 31, 1997, and January 14, 1999, violated G.L.c. 176D, §3 (9)(f). A violation of G.L.c. 176D, §3 (9)(f), is an unfair act in the business of insurance and therefore a violation of G.L.c. 93A, §2. See Van Dyke v. Saint Paul Fire and Marine Insurance Co., 388 Mass. 671, 675 (1983).
V. THE THALER-LAZARIS ISSUE
The case of Thaler v. American Insurance Co., 34 Mass.App.Ct. 634, 643 (1993), does not affect the Chapter 93A liability or damages in the present case. During the brief life of the Thaler rule, once liability was reasonably clear an insurer was precluded from conditioning a fair settlement offer on obtaining a release from the insured. The Thaler rule was rejected by the Supreme Judicial Court in Lazaris v. Metropolitan Property and Casualty Insurance Co., 428 Mass. 502, 504 (1998). In the present case, Commerce chose to make no offer of the policy amount, with or without a release condition, until January 14, 1999. By that time, the Lazaris case again made it legally permissible for an insurer to condition an offer on obtaining a release from the insured. If Commerce had offered the policy amount on July 31, 1999, without conditioning the offer on a release by Mr. Senior, the plaintiff would have accepted the policy amount from the insurer and would have still pursued an additional amount from Mr. Senior. The cause of the Chapter 93A damages in this case was Commerce’s delay in making any offer of the policy amount until January 14, 1999.
VI. DAMAGES AND ATTORNEYS FEES AND COSTS
The first element of the Lane family’s Chapter 93A damages is the loss of use of the $100,000 fair insurance settlement amount from August 1, 1997, until Commerce’s January 14, 1999, written offer of the policy amount. Hopkins v. Liberty Mutual Insurance Co., 434 Mass. 556, 567 (2001); Kapp v. Arbella Mutual Insurance Co., 426 Mass. 683, 686 (1998); Clegg v. Butler, 424 Mass. 413, 424-25 (1997). A low-risk investment would have paid approximately six percent in annual interest during this period. The plaintiffs damages for loss of use of the money are $8750 ($6000 for the first year and $2750 for the additional five and a half months).
The plaintiff argues that his attorney fees in obtaining the $100,000 insurance offer to settle the wrongful death claim amounts to an additional component of fair Chapter 93A damages. Attorney fees for the underlying tort case are not normally part of the actual damages in a case against an insurer under Chapters 93A and 176D. The attorney fees for successfully pursuing the Chapter 93A claim are recoverable by statute as a separate item, but they are not treated as part of the plaintiffs actual damages.
The plaintiffs brother, Attorney Gerard F. Lane, originally represented the plaintiff in the Lane family’s claim against Mr. Senior and Commerce for wrongful death damages. Attorney Lane represented the plaintiff from early April until September 1997. Bletzer & Bletzer, P.C., represented the plaintiff from that point on. Bletzer & Bletzer, P.C. has a one-third contingency fee agreement with the plaintiff. The plaintiff contends that his brother was representing him for no fee. For this reason he argues that the Commerce’s delayed settlement offer caused him additional actual damages in the form of the one-third fee that he must pay to Bletzer & Bletzer, P.C.
*301 The evidence is less than crystal clear on whether Attorney Lane was serving for no fee, a reduced fee, or the customary one-third. The plaintiff testified that his brother had provided the family legal services in the past for no fee and that he expected that his brother would not charge a fee for his services in this case.
Attorney Lane did not testify, but brief excerpts from his deposition were introduced in evidence. Attorney Lane testified at his deposition that his brother “hired me” to try to settle the case and that “we brought a civil action” for wrongful death. He said that he was also “engaged to settle the estate” of Mrs. Lane. Attorney Lane testified at the deposition that his brother “had a nerve taking the case away from me after I did all the work.”
Attorney Lane was expecting some fee for his services in the insurance claim for the policy amount and in the wrongful death action. The evidence does not persuade the court that Attorney Lane would have taken no fee if Commerce had offered the policy amount by July 31,1997. Instead, the court finds from all the circumstances that Attorney Lane would be likely to have taken a reduced fee of half of the traditional one-third if Commerce had offered the $100,000 by the end of July.
Due to the powerful liability and damages evidence, Attorney Lane was expecting a prompt settlement, at least with the insurer. Had he obtained a prompt and fair settlement, it is probable that he would have accepted only a reduced fee from his family. If the litigation were to become difficult, Attorney Lane would not have been suitable to remain on the case due to his age, poor health and emotional involvement. As it turned out, the extended litigation made it necessary for the family to retain attorneys with more appropriate litigation capabilities. The difference between Attorney Lane’s probable reduced fee and Bletzer & Bletzer’s one-third fee is a fair component of the plaintiffs actual damages caused by the insurer’s delay in making a fair settlement offer in this case. This was a cost “directly resulting from the insurer’s conduct.” Kapp v. Arbella, supra. The amount of this component is $16,667.
The plaintiff also argues that Commerce’s delay in offering the insurance proceeds caused further damages by delaying his settlement with Mr. Senior. Mr. Senior did eventually reach a settlement agreement with the plaintiff to pay an amount in addition to the insurance policy limit amount. The Commerce delay did not cause any additional damages regarding the Senior settlement. Mr. Senior, upon the advice of his criminal defense attorney, was determined to “exercise his right of silence until the completion of his trial, criminal proceedings and/or exposure to incarceration.” Ex. 2, p. 65. If Commerce had offered the policy amount on July 31, 1997, it would not have significantly affected the timing or the amount of the plaintiffs settlement with Mr. Senior for additional payments.
Finally on damages, this is not a multiple damages case. There was no willful or knowing violation of Chapter 93A. There was only a collective misjudgment about the clear likelihood of a plaintiffs verdict.
The plaintiff is also entitled under G.L.c. 93A, §9 (4) to recover his reasonable attorney fees and costs that are fairly attributable to the Chapter 93A claim and proportionate to the Chapter 93A damages. Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979).
VIL ORDER
A judgment will enter for the plaintiff with damages in the amount of $25,417 plus twelve percent interest on this amount from April 3, 2001, the date the complaint was entered. Chapter 93A attorney fees and costs will also be included in to the judgment.
Plaintiffs counsel may submit an affidavit of reasonable attorney fees and costs attributable to the successful Chapter 93A claim. If the defendant’s counsel objects to the amounts sought for attorney fees and costs, he may file a brief written opposition and a hearing request within two weeks of receipt of plaintiffs counsel’s affidavit.

The court fully adopts the parties’ Stipulation of Facts (Ex. 1) as part of its findings.
Counsel for both parties well served their clients and the court with their professional presentations throughout the trial.

The Plymouth Police reports received by Commerce in April may not have been complete, but Commerce did have complete reports from the Plymouth Police well before the end of July 1997.

The parking lights on Mrs. Lane’s Tempo light up on the sides of the car’s comers as well as the front. See Ex. 8. This is a common feature in today’s automobiles.
Of course headlights, had they been lighted, would have made the Tempo more visible to Mr. Senior, even if the beams had been pointing perpendicular to his direction of travel.

The parties stipulated that the average elimination rate of alcohol from a person’s body is .015 percent per hour beginning approximately thirty minutes after the last drink. The alcohol elimination rate is discussed in Commonwealth v. Senior, 433 Mass. 453 (2001), the decision in the appeal of Mr. Senior’s conviction. Commerce did not need an expert witness to realize that Mr. Senior’s blood alcohol level would have been much higher than .091 four and a half hours before the blood test.

The complaint also named as defendants the owner of the establishment where Mr. Senior had been drinking and a manager for the owner.

An unfounded aura of scientific certainty often accompanies accident reconstructionists and other forensic experts. The Northeast speed estimate depended on many assumptions that may or may not conform to the actual events of the accident. Carefully prepared opinions on speed or “point of no escape” would likely have been admissible, but they would not necessarily carry more weight than the observations of witnesses at the scene.
The Northeast diagram, Ex. 25, seems to have misinterpreted the location of the skidmark as beginning 40.5 feet before the point of impact. At the scene on April 5, Officer *302 O’Hara measured the skidmark as forty feet and five inches ending at the “rear point of this same [Senior truck] tire’’ at its point of rest following the collision. Ex. 2, p. 78. As mentioned earlier in this decision, the police report identified the point of impact as fifty-one feet before the truck’s point of rest. The skidmark therefore did not begin until after the point of impact.
A stop sign at the southwest curved end of Pilgrim Trail (Ex. 26) also seems to be missing from the Northeast diagram.

Commerce received the plaintiffs second Chapter 93A demand letter on December 21, 1998. See Ex. 27. Commerce offered the policy amount to the plaintiffs attorney in telephone calls around that date. Commerce put its offer in writing to the Lanes’attorney on January 14, 1999. The issue of a release from Mr. Senior, the pending 93A claim and other issues added some complications to the negotiations. For this reason, the court will treat Commerce’s detailed written January 14, 1999, letter as the first definitive offer of the policy amount.