Haggerty, S. JaNe, J.

INTRODUCTION

The plaintiffs, Raymond and Alice Tallent (“the Tallents”), bring this G.L.c. 93A claim against the defendant. Liberty Mutual Insurance Company (“Liberty Mutual”), for violations of G.L.c. 176D. In the underlying action, the Tallents sued Turner Construction Company, Inc. (“Turner”), an insured of Liberty Mutual, for negligently erecting scaffolding that collapsed and caused permanent injuries to Mr. Tallent. The Tallents allege that Liberty Mutual violated G.L.c. 176D by refusing to settle without conducting a reasonable investigation and failing to settle their claim despite the fact that Turner’s liability was reasonably clear. After a trial, without a juiy, and based upon all the credible evidence, the court makes the following findings of fact and rulings of law.

FINDINGS OF FACT

I make the following factual findings based on the exhibits and testimony produced at trial.

A. The Trial, the Post-Trial Motions and the Appellate Proceedings

On April 9, 1986, Raymond Tallent, an iron worker, was injured at a construction site for a new office building at 150 Federal Street, Boston, Massachusetts. Raymond Tallent crashed to the ground from unsecured scaffolding which ultimately rendered him permanently disabled and unable to work. Turner was the general contractor and was responsible for ensuring safety at the construction site. Turner was insured by the defendant, Liberty Mutual.
Raymond Tallent and his wife Alice Tallent filed suit against Turner in November 1986 seeking damages for Mr. Tallent’s injuries and Mrs. Tallent’s loss of consortium, resulting from Turner’s negligent construction and maintenance of the scaffolding and planking which Raymond Tallent was using at the time of the accident. Turner filed third-parly claims against Raymond Tallent’s employer, Dorel Steel Erection Corporation (“Dorel”) and Owen Steel Company, Inc. (“Owen”), the steel fabricator for the project on claims for contractual indemnification. Dorel was a sub-contractor to Owen and Owen was a sub-contractor to Turner. Prior to trial, Turner admitted in its answers to interrogatories that it had erected the scaffolding. At trial, Turner’s defense was three-fold: Raymond Tallent was negligent, which the juiy rejected; the planking for the scaffolding did not belong to Turner, despite the fact that there was testimony that Turner employees erected the scaffolding, there were admissions in answers to interrogatories that Turner erected the scaffolding, and there was testimony that Turner employees worked on the scaffolding in the area where the plaintiff fell shortly before his fall; and the damages claimed by Tallent were excessive, despite the fact that there was uncontroverted evidence that Raymond Tallent’s past and future loss of earning capacity was in excess of $700,000 and Turner conceded that Raymond Tallent was permanently disabled from employment as an iron worker.
In addition to the negligence and consortium claims against Turner, the trial judge submitted special questions concerning the negligence of Dorel and Owen for a future determination by the court of contractual indemnification obligations. On October 8, 1993, the juiy returned a verdict against Turner for Raymond Tallent in the amount of $1,000,000 and for Alice Tallent in the amount of $100,000. The jury found negligence but no causation against Dorel and no negligence against Owen. The value of the verdict in October 1993, including pre-judgment interest, was $2,006,340.
Prior to trial, Turner filed a motion in limine to preclude the introduction of evidence relating to insurance coverage. The motion was allowed. Turner also filed a motion in limine to exclude hearsay testimony that prior to the accident, an employee told Turner that the scaffolding was faulty. This motion was likewise allowed.
At trial, Raymond Tallent testified to the hearsay statement which was the subject matter of the motion in limine. Both parties objected, the objection was sustained and the juiy were instructed to disregard the testimony. Turner moved for a mistrial which was *462 denied. During the course of the testimony of an expert for the Tallents, the expert volunteered that he had done work for Liberty Mutual. Turner moved for a mistrial which was denied.
Turner filed post-trial motions raising, inter alia, the denial of the motions for a mistrial based upon the evidentiary issues, a motion for new trial on a claim that the verdict was against the weight of the evidence, and a request for judgment notwithstanding the verdict relating to the indemnification claims against Dorel and Owen. The trial judge heard the motions in November 1993 and denied the motions in a Memorandum of Decision and Order which was docketed on January 27, 1994. In his Memorandum of Decision, the trial judge concluded that “the prejudicial effect of the violations [of the court’s orders on the motions in limine] was not such that declaration of a mistrial is warranted in view of the substantial evidence supporting the verdict.” Turner filed a notice of appeal in February 1994, after judgment issued on February 7, 1994.
The transcripts of the trial were completed in May 1995. The Appeals Court heard oral argument on December 5, 1996. The centerpiece of Turner’s appeal was the issue of contractual indemnity as evidenced by the allocation of more than the first two-thirds of the argument section of the brief to the topic. The final argument in the brief was a claim that the trial judge abused his discretion in failing to give a curative instruction upon mention by the witness of “Liberty Mutual,” despite the absence of such a request at trial. Turner also claimed that the judge abused his discretion in failing to declare a mistrial when Raymond Tallent testified to a hearsay statement. Turner additionally claimed that the combined effect of the missteps warranted a new trial, as Turner did in its motion for a new trial before the trial judge.
The judgments of the Superior Court and the denial of Turner’s motion for a new trial were affirmed in a Memorandum and Order Pursuant to Rule 1:28, entered on May 1, 1997. The Supreme Judicial Court denied Turner’s Application for Further Appellate Review on July 3, 1997. On August 20, 1997, Liberty Mutual paid the Tallents $2,924,665, which included the judgment, and prejudgment and postjudgment interest.

B. The Relationship Between the Attorneys, the In-House Activities at Liberty Mutual, and the Negotiations to Settle

At trial, during the pre-trial proceedings, and post-trial motions, Attorney Ann Marie Maguire (“Maguire”) represented the Tallents. Attorneys Henry DuL-aurence (“DuLaurence”) and Charles Mahanor (“Mahanor”) of Liberty Mutual represented Turner. The relationship between Maguire and DuLaurence was acrimonious, at best, and somewhat less so between Maguire and Mahanor. Maguire and DuL-aurence did not speak to each other. The “bad blood” between Maguire and DuLaurence found its source in two prior cases in which the attorneys represented opposing parties: Maguire for the plaintiffs and DuL-aurence for Liberty Mutual. The intensity of the hostility in the Tallent case led to Maguire’s filing an application for a temporary restraining order against DuLaurence sometime following the Tallent trial. The application was subsequently withdrawn. The hostile relationship between Maguire and DuLaurence, and to a lessor extent between Maguire and Mahanor infected some of Liberty Mutual’s decisions during the pendency of the appeal.
The events between the filing of the notice of appeal in February 1994, and the payment of the judgment in August 1997, are the basis for the Tallents’ claim against Liberty Mutual that it violated the provisions of G.L.c. 176D, §3(9)(d) and (f). During the trial and up to some time in the fall of 1995, Philip McCarthy (“McCarthy”) was employed by Liberty Mutual as a Regional Property Specialist who handled large claims against Turner. Since 1966, McCarthy had occupied a variety of positions with Liberty Mutual, including claims adjuster, claims manager and claims supervisor for the home office. McCarthy’s responsibilities in the Tallent case included daily attendance at the trial to provide his independent observation and evaluation of the trial developments. At the end of each day, McCarthy entered his daily summary in Liberty Mutual’s electronic claims log, the ACES system which was accessible to all Liberty Mutual employees involved in the case, including its attorneys. The summaries were written to Julien Savoie (“Savoie”), who was Liberty Mutual’s Home Office Examiner. As early as September 29, 1993, McCarthy opined that there was little chance of a defense verdict. By the end of the trial, McCarthy and the defense attorneys believed that the Tallents would prevail against Turner. McCarthy was not surprised by the amount of the verdict but he was surprised by the defense verdicts for the subcontractors, Dorel and Owen.
Turner filed post-trial motions relating to the evi-dentiary issues and a request for judgment notwithstanding the verdict relating to the indemnification and contribution claims against Dorel and Owen. The trial judge heard the motions in November 1993, and denied the motions in a Memorandum of Decision and Order which was docketed on January 27, 1994. McCarthy agreed with the trial judge’s assessment of the effect of the evidentiary issues: despite the violation of the court’s orders there was no prejudicial impact on the jury.
In a memo to McCarthy from Mahanor dated February 2, 1994, Mahanor outlined what he believed were the grounds for appeal. In the memo, Mahanor stated that “(b]y taking an appeal of the denial of these [post-trial] motions, it may make counsel for the plaintiffs more amenable towards any potential settlement *463 negotiations.” In McCarthy’s view, this latter statement was not a valid reason for pursuing an appeal.
Savoie, the Home Office Examiner became involved in the Tallent case at least as early as January 18, 1993. He was responsible for reviewing the work of the employees at the branch level of Liberty Mutual and for obtaining authorization for settlement of the cases, if appropriate. In his capacity as Home Office Examiner, Savoie reviewed and wrote ACES notes. Prior to trial, on January 18, 1993, Savoie admitted that “liability doesn’t look very good for us since it appears the insured [Turner] may have set up and maintained the staging in question.”
Following the denial of Turner’s post-trial motions, Maguire began the campaign to be paid the amount of the judgment or, in the alternative, to settle the case for less than the judgment. Maguire first dealt with McCarthy approximately one to two weeks following the post-trial motions. She learned that Turner would appeal. Once the notice of appeal was filed, Maguire contacted Jerry Cook (“Cook”), an adjuster for Liberty Mutual and a troubleshooter for difficult cases. In the first round of telephone calls to Cook in the Spring of 1994, Maguire gave him a summary of the case and the trial, described the animosity with DuLaurence in the Tallent case and the history leading to the acrimony, and emphasized that the weakness of the issues on appeal would result in the affirmance of the judgment for the Tallents. Cook learned from Maguire that her demand prior to trial was $900,000 and that she was not willing to accept that amount post-trial. A summary of these discussions between Cook and Mag-uire were documented in the ACES log for viewing by Liberty Mutual employees. DuLaurence expressed some concern that the case might be settled during the pendency of the appeal. Savoie increased the reserves to $1 million.
In the second round of conversations in the fall of 1994, Maguire told Cook of the bleak situation of her client: the Tallents had no money and Raymond Tal-lent was unemployable. Cook told Maguire that DuL-aurence had a very different view of the likely outcome of the appeal. In October 1994, the value of the judgment with interest was in excess of $2.16 million. Maguire made a demand of $2 million. She emphasized that the record of the trial would support her view that the Tallents would prevail on appeal. She further argued to Cook that even if the Appeals Court granted a new trial the Tallents would nonetheless prevail. Cook said that the demand would not be acceptable to Liberty Mutual. He opined in an ACES note that he thought Maguire would settle for $1.5 million and recommended that the reserves be increased to $1.5 million.
During this period, McCarthy had no confidence that Turner would prevail in the appeal and emphasized that the case should be settled before the appeal. His views, as well as those of Cook were expressed in the ACES notes. McCarthy, who had reviewed Cook’s ACES notes thought that an offer of $1.5 million might settle the case. In a subsequent ACES note, Cook then asked for $1.5 million to settle the case in the event that $1 million was rejected. He also expressed the view that Liberty Mutual should “get on with” the settlement. Savoie responded in an ACES note that he had consulted with Mahanor who thought that Turner’s appellate issues were strong. This was Mahanor’s first appellate case. Based on Savoie’s conversation with Mahanor, Savoie described Maguire as “arrogant and intractible [sic]” in a December 5, 1994 ACES note. After Savoie consulted with the claims management personnel of Liberty Mutual he withheld from Cook the authority to settle. As there was no scheduled hearing date at that time in the Appeals Court, Savoie indicated that there was no reason for Liberty Mutual to make an offer to settle the case. Cook responded that he disagreed with Savoie’s decision to make no offer to the Tallents and with Mahanor’s description of Maguire.
When Cook called Maguire on December 7, 1994 to tell her that there would be no offer to settle Maguire suggested that the case be presented by a panel of plaintiff and defendant representatives to personnel at Liberty Mutual for their valuation of the case. Cook conveyed this information in the ACES log. He also noted that a new trial might well be a pyrrhic victory even if the jury awards the Tallents less because there would be additional legal fees and additional interest added to the judgment. This communication led to Savoie’s inquiry in an ACES note whether Liberty Mutual could settle with Turner and continue to maintain the appeal against Dorel and Owen on the indemnification issue. On December 14, 1994, Cook responded that Savoie should get an opinion from Liberty Mutual’s legal department.
It was not until May 11, 1995 that Savoie made a request of the home office legal department of Liberty Mutual for an assessment of Turner’s “chances for a new trial.” On August 18, 1995, Attorney Michael Skeary (“Skeary”), another employee of Liberty Mutual answered the request in a memo to Savoie addressing four specific inquiries of Savoie and he did so without reviewing the transcript of the trial which was available as early as May or June 1995. Skeary was not an “independent” voice in this matter. He had worked for Liberty Mutual for approximately six years and reviewed cases for potential appeals. Skeary rarely assessed cases for the viability of the appeal after the filing of the notice of appeal, as he did in this case. However, Skeary rightly concluded that the verdict was not against the weight of the evidence and that appeal on the issues underlying Dorel and Owen could proceed even if Liberty Mutual settled with the Tallents. Conversely, he mistakenly opined that there was a “strong possibility of obtaining a new trial on *464 appeal” based upon violations of the orders on the motions in limine.
Prior to the third round of discussions between Cook and Maguire, DuLaurence entered a rather free-ranging note in the ACES log on April 24 and 25, 1995. Not only did DuLaurence forcefully discourage settlement, he assumed that the appeal would find its way to the Supreme Judicial Court and in that forum, the evidentiary violations of the court’s rulings on motions in limine would not be tolerated. He also mentioned tort reform and a prior case he had handled in the Appeals Court regarding a trial judge’s absence from the trial during the playing of a video-taped deposition.
In early May 1995, Cook and Maguire resumed their discussions. On May 2, 1995, Maguire told Cook that she had heard that Liberty Mutual had fired DuL-aurence and she wondered if that changed Liberty Mutual’s position on settlement. In his ACES note reflecting his conversation with Maguire, Cook again mentioned that “this is decision time,” that McCarthy feels that the case should be settled and that the opportunity for settlement is “unlikely to ever be better.” Cook also noted that the last demand was for $2 million.
Maguire called Cook on May 10, 1995. She offered to do a mock trial for the decision makers at Liberty Mutual. She reaffirmed her demand of $2 million and pointed out that the value of the verdict was then $2.25 million. No offer was forthcoming. During these conversations the trial transcript was still unavailable although it was completed in late May 1995.
In October 1995, Turner filed its appellate brief and the Tallents filed their brief in January 1996. On January 23, 1996, Maguire wrote a demand letter to Liberty Mutual pursuant to G.L.c. 93A, §9 and G.L.c. 176D, §3(9)(b), (c), and (f). In the letter, Maguire detailed the facts and summarized the verdict and post-trial motions. She described Raymond Tallent’s condition of disability and unemployability, as well as the basis for the jury’s award of $1 million to Raymond Tallent. Maguire also pointed out that Turner’s appellate brief did not raise the issue of liability or damages but rather Turner argued primarily the indemnification issue and the two evidentiary issues. Maguire concluded that “liability and damages are more than reasonably clear” and demanded the jury award plus interest.
Attorney Marc L. LaCasse (“LaCasse”) of McC-ormack and Epstein responded to Maguire’s demand letter on February 23, 1996 and indicated in his response that his firm had been retained by Liberty Mutual for the purpose of responding to Maguire’s January 23, 1996 letter. From the response, it is clear that LaCasse viewed the basis of Maguire’s demand pursuant to G.L.c. 93A and c. 176D to be Turner’s alleged frivolous appeal of the jury verdict and the post-trial motions. He pointed out that if the Appeals Court granted a new trial on the basis of the eviden-tiary issues the “liability and damages will once again be at issue.” In the letter, LaCasse responded to each of the provisions of G.L.c. 176D, §3(9) which were allegedly violated. He claimed that the Tallents failed to allege any injuries suffered at the hands of Liberty Mutual. Finally, LaCasse offered to mediate the case through the Appeals Court mediation program. On March 19, 1996, Maguire responded that liability was “nearly indisputable” prior to trial since Turner conceded that it was responsible for ensuring a safe workplace, it had erected the scaffolding, and Raymond Tallent was injured when an unsecured plank slipped out from the scaffolding. As for the responsibility of Liberty Mutual, Maguire wrote that the insurance carrier has a duty to effectuate, a prompt, fair and equitable settlement once liability becomes reasonably clear. She concluded that the damages consisted of the verdict, interest and attorneys fees and that the Tallents wanted an offer and not mediation.
There was additional correspondence between Mag-uire and LaCasse relative to the Tallents’ demand. Finally, on May 13,1996, LaCasse offered a structured settlement to Raymond Tallent, consisting of an immediate cash payment of $300,000 to include attorneys fees and liens, monthly payments of $1,191 to the then fifty-five-year-old Raymond Tallent, and an immediate cash payment of $45,000 to Alice Tallent. On June 7, 1996, Maguire responded that the offer was unacceptable and noted that the then present day value of Liberty Mutual’s offer was between $500,000 and $600,000, less than one-half of the interest that had accrued on the juiy award. Maguire and the Tallents viewed the offer as “yet another example of Liberty Mutual’s continued unfair settlement practices.”
Following the failed settlement attempt, the parties agreed to mediate and selected William Dailey as the mediator. On September 6, 1996, Mahanor wrote to counsel for Dorel and Owen inviting their participation in the mediation. He made clear in the letter that the appeal against Dorel and Owen would proceed even if a settlement could be reached between the Tallents and Turner. Dorel and Owen did not attend the mediation.
Maguire, Mahanor and LaCasse participated in the mediation in the fall of 1996. During the pendency of the mediation, the case was argued in the Appeals Court. Just prior to the oral arguments, the demand of the Tallents was $1.8 million and the value of the verdict was $2.8 million. Following the oral arguments, the Tallents raised their demand to $2.2 million due to their assessment of the strength of their oral argument. At this time, Liberty Mutual’s offer was $1.4 million. On February 10, 1997, Debi Hopkins (“Hopkins”), who had replaced McCarthy in the Tallent case, asked Savoie if Liberty Mutual might reconsider its position. On March 20, 1997, Savoie responded that Liberty Mutual would stand by its position.
*465 On April 4, 1997, the Tallents filed a complaint alleging violations of G.L.c. 93A and c. 176D. On May 1, 1997, in a Memorandum and Order pursuant to Rule 1:28, the Appeals Court affirmed the judgment of the trial court. On May 21, 1997, Turner filed an application for further appellate review which was denied by the Supreme Judicial Court on July 3, 1997. Final judgment entered in the Superior Court on July 17, 1997. On August 20, 1997, Liberty Mutual paid the Tallents a total of $2,924,665, which included $918,325 in postjudgment interest. Upon receipt of the money from Liberty Mutual, the net to the Tallents after payment of attorneys fees and costs was approximately $1.6 million. The Tallents invested $1.1 million in a conservative portfolio investing 50% in stocks and 50% in bonds.
During the pendency of this case, Attorney Kathy Jo Cook, the successor counsel in this suit wrote a “Supplemental Demand Letter” on February 2, 2000, to LaCasse, in which she demanded $150,000 for the severe emotional distress of the Tallents and $12,993 in legal expenses for the appeal. LaCasse responded that there is no provision in the law for a supplemental demand letter, the supplemental letter was untimely, and there was no bad faith on the part of Liberty Mutual.
C. The Duty of Liberty Mutual
I credit the testimony of Arthur A. Kiriakos (“Kiriakos”), an independent adjuster who provides services to insurance companies and individual claimants. Kiriakos conducts field investigations, performs claims evaluations and provides expert testimony for c. 176D and c. 93A claims. He has worked in the insurance industiy in many capacities, including as a claims supervisor and director of claims litigation for in excess of twenty years. Based upon the discrepancies in the points of view of McCarthy and Mahanor on the likely success of an appeal, Liberty Mutual had a duty to get a second independent opinion on the viability of the appeal. Liberty Mutual’s knowledge of the hostility between DuLaurence, Mahanor and Mag-uire further underscored the need for an independent opinion on the merits of the appeal.
I also find persuasive the testimony of Alice Olsen Mann (“Mann”), an attorney with many years of appellate and insurance defense experience. From 1981 to 1998, she was an associate and then a partner at the firm of Morris, Mahoney and Miller, LLP an insurance defense firm. In 1981, Mann staffed an appellate department at her firm and she handled all appeals for the insurance companies represented by the firm. Since 1998, Mann has been a solo practitioner who continues to deal with insurance coverage issues and continues to do appellate litigation as well. A substantial part of Mann’s practice deals with c. 176D and c. 93A claims for insurance companies.
I also credit Mann’s testimony that the obligation of an insurance company post-verdict is to evaluate objectively the appellate issues, if any, and the reasonable likelihood of success on those issues. Further, if there is no reasonable likelihood of prevailing on appeal then the jury verdict establishes that the liability of the insurance company is reasonably clear. I also credit Mann’s testimony that the likelihood of success of the two evidentiary issues on the appeal involving the Tallents and Turner was virtually nonexistent and this is something that a reasonably experienced appellate attorney would know simply by reading the trial judge’s decision on Turner’s post-trial motions.

D. The Loss of Use of the Judgment Amount

I accept as credible the deposition testimony of Sherwood Small (“Small”), who at the time of his testimony was the president of Boston Private Value Investors, an investment management company. As an investment advisor, Small conducts an historical analysis for a given period of time and measures the performance of an investment against indices for common stock, value stock, bonds and a mix of stocks and bonds.
Small performed numerous calculations concerning the investment of an amount of money equivalent to the following: 1) to the value of the judgment on the day of the verdict (October 8, 1993); 2) the value of the judgment on the date of the verdict (October 7, 1993), minus 40% in attorneys fees and $35,000 in expenses; 3) the value of the judgment on the date that judgment issued following the post-trial motions (February 7, 1994); and, 5) the value of the judgment on the date that the judgment issued (February 7, 1994), minus 40% in attorneys fees and $35,000 in expenses.[2] The end date for the calculations was August 20, 1997, the date that Liberty Mutual paid the Tallents. Small applied to the foregoing sums and periods of time the compound rates of return of the S&P 500, the Dow Jones Industrial, and the Russell indices, and government bonds. He further calculated the rate of return on a mixed portfolio of stocks and bonds. A conservative portfolio for a person in his 50s, as Tallent was in 1994, in the relevant time period was 50% in stocks and 50% in bonds. The rates of return using a blended portfolio of 50% in stocks and 50% in bonds for the time period from February 7, 1994[3] to August 20, 1997 were as follows: 15.9% for the S&P 500 and government bonds; 12.74% for the Russell 1000 value and government bonds; and 15.98% for the Dow Jones industrial and government bonds.

RULINGS OF LAW

Chapter 93A was implemented to prevent unfair and deceptive practices in trade or commerce and to provide a cause of action for consumers to recover for damages that result from these practices. G.L.c. 93A, §2. Similarly, the purpose of G.L.c. 176D is to deter unfair and deceptive acts or practices in the business of insurance. G.L.c. 176D, §2. Section 3(9) of G.L.c. 176D defines the unfair or deceptive acts or practices *466 that are considered a violation of G.L.c. 176D. However, G.L.c. 176D does not provide a cause of action for an individual who suffers damages as a result of an insurer’s violation of the statute. Instead, “[a]ny person whose rights have been affected by an insurance practice that violates G.L.c. 176D, §3(9), may sue under G.L.c. 93A.” Murphy v. National Union Fire Ins. Co., 438 Mass. 529, 532 n.5 (2003). The injured party is entitled to recover for all losses which were the foreseeable consequence of the insurer’s unfair or deceptive act or practice. Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 566 (2001).
In the present case, the Tallents brought a c. 93A claim against the defendants for alleged violations of G.L.c. 176D, §3(9). The plaintiffs claim that Liberty Mutual violated subsections (d) and (f)[4] of 176D, §3(9) by failing to conduct a thorough investigation which resulted in Liberty Mutual’s failure to settle the case once liability became reasonably clear. Liberty Mutual argues that the Tallents’ c. 93A claims are barred because they failed to send a demand letter that complied with the statutory requirements. In the alternative, Liberty Mutual argues that it did not violate G.L.c. 176D, §3(9)(d) or (f) because liability was not reasonably clear until the appellate process was fully exhausted and that it conducted a reasonable investigation into the viability of the appellate issues after the denial of its post-trial motions.

A. The Sufficiency of the Demand Letter

Chapter 93A requires that the plaintiffs set out their demands in a letter which must be sent at least thirty-days before the filing of a claim. G.L.c. 93A, §9(3). A demand letter listing the specific unfair and deceptive practices alleged is a prerequisite to filing a c. 93A complaint. Spring v. Geriatric Authority of Holyoke, 394 Mass. 274, 287 (1985). Any relief that is not set out in the demand letter cannot be granted. Clegg v. Butler, 424 Mass. 413, 423 (1997). “The purposes of the demand letter are twofold: (1) ‘to encourage negotiation and settlement by notifying prospective defendants of claims arising from allegedly unlawful conduct’ and (2) ‘to opemte as a control on the amount of damages which the complainant can ultimately recover if he proves his case.’ ” Spring v. Geriatric Authority of Holyoke, 394 Mass, at 288, quoting Slaney v. WestwoodAuto, Inc., 366 Mass. 688,704 (1975). A demand letter must reasonably describe the unfair practice alleged and the injuiy suffered in a manner which provides the prospective defendant with an opportunity to review the facts and law involved to see if the requested relief should be granted or denied. Id. Where a demand letter is statutorily insufficient, the c. 93A claim must be dismissed. Bressel v. Jolicoeur, 34 Mass.App.Ct. 205, 211 (1993).
The appellate courts have upheld the sufficiency of a demand letter in various situations. In Williams v. Guff Insurance Co., the plaintiffs suffered property-damage to buildings insured by the defendant. 39 Mass.App.Ct. 432, 432-33 (1995). After extensive correspondence concerning the amount of damage to be covered, the insurer decided to execute its option to repair the damage itself instead of issuing an insurance award. Id., at 433. However, the insurer never repaired the building. Id. The plaintiff brought a c. 93A complaint against the insurer for violating c. 176D, §3(9)(f), and the trial court found for the plaintiff. Id., at 433. On appeal, the defendant argued that the Tallents’ c. 93A demand was insufficient because it only alleged that the defendant had failed “to effectuate a prompt, fair and equitable settlement.” Id., at 435-36. The court held this language sufficient in the context where the insurance company did not contest liability and it was well aware of the facts surrounding the claim before it received the demand letter. Id., at 436.
In Fredericks v. Rosenblatt, the trial court dismissed the plaintiffs c. 93A claim because it found that the demand letter failed to state an injury. 40 Mass.App.Ct. 713, 714 (1996). However, the Appeals Court reversed this decision holding that the demand letter was sufficient because it “[cjoncretely described the purported injuiy - the loss of the plaintiffs property damage claim against the MBTA resulting from his having executed the first general release at the urging of the defendants - and that the amount of damages claimed was reasonably ascertainable.” Id., at 717. Fredericks indicates that a c. 93A demand letter is sufficient as long as the content of the letter allows the recipient to understand what injuiy the plaintiff has suffered.
The appellate courts have also held the contents of a c. 93A demand letter to be sufficient when the information provided the defendant with “ ‘an opportunity to review the facts and the law involved to see if the requested relief should be granted or denied’ and to enable [it] to make ‘a reasonable tender of settlement’ in order to limit the recoverable damages.” Brandt v. Olympic Construction, Inc., 16 Mass.App.Ct. 913, 915 (1983), citing York v. Sullivan, 396 Mass. 157, 162 (1975). In Brandt the court held that a demand letter that did not list the specific money or property loss was sufficient because it “reasonably described the deceptive acts relied on and was sufficient to give the defendant an opportunity to review the facts and the law involved to see if the requested relief should be granted or denied and to enable [the defendant] to make a reasonable tender of settlement in order to limit the recoverable damages.” 16 Mass.App.Ct. at 915. The court further stated that a c. 93A letter should not be held to the same standard as a c. 93A complaint. Id.; see also Tarpy v. Crescent Ridge Dairy, Inc., 47 Mass App.Ct. 380 (1999) (where a demand letter that failed to specify the dollar amount requested was not fatal to the c. 93A claim since the letter was otherwise comprehensive and detailed).
In this case, the original c. 93A demand letter dated January 23, 1996, and the supplemental correspondence through July 3, 1996, provided the defendant with sufficient information to review the facts and law surrounding the allegations and adequately described *467 the Tallents’ injuries.[5] The first demand letter specifically stated that Liberty Mutual had failed to pay the Tallents the judgment to which they were entitled as a result of Turner’s negligence and the supplemental correspondence during the six-month period informed Liberty Mutual of its failure to adequately investigate the merit of the issues on appeal and to effectuate a prompt, fair and equitable settlement. The original letter also stated that Raymond Tallent was not working, that he would not be able to work in the future and described his specific physical injuries that prevented him from working. This language clearly indicates that the Tallents were suffering financially because the defendants failed to pay the judgment. In addition, the correspondence by the attorney to the defense attorney during this six-month period asserts that the Tallents were continuing to pay legal fees. The correspondence provided sufficient information for Liberty Mutual to identify the Tallents’ injuries.
Furthermore, this was not correspondence that Liberty Mutual received without having any background of the underlying claim. Liberty Mutual had an advisor at the trial every day who made daily reports. It knew that a jury had assessed damages against its insured and that the Tallents were suffering physically and financially as a result of its insured’s negligence. Given the specific language of the original and supplemental demand letters, and the depth of Liberty Mutual’s knowledge of the underlying claim, this Court concludes that the c. 93A demand letter and the supplemental correspondence in 1996 meet the statutory requirements.

B. Violations of G.L.c. 176D

An insurance company is held to the duty of good faith and fair dealing as defined under G.L.c. 176D, §3(9) whether it is dealing with its insured or third-party claimants. Bobick v. United States Fid. & Guar. Co., 439 Mass. 652, 658-59 (2003). These duties apply not only to pre-trial and trial process, but also to appellate procedures. Davis v. Allstate Insurance Co., 434 Mass. 174, 187 n.13 (2001).
The Tallents allege that Liberty Mutual breached its duty to them, as third-party claimants, by failing to settle the case promptly once liability became reasonably clear. They also allege that Liberty Mutual breached its duty when it failed to conduct an adequate investigation of the appellate issues. This Court addresses each allegation in turn.

1. Chapter 176D, §3(9) ff): When Liability Became Reasonably Clear

One manner in which an insurer can breach its duty of good faith and fair dealing to a third party is by failing to effectuate prompt, fair, and equitable settlements of claims when liability has become reasonably clear. G.L.c. 176D, §3(9)(f). See Hopkins, 434 Mass, at 562. Liability for the purposes of G.L.c. 176D, §3(9) (f) encompasses both fault and damages. Clegg, 424 Mass, at 421 (1997). In determining whether liability is reasonably clear, “[t]he test is not whether a reasonable insurer might have settled the case within the policy limits, but whether no reasonable insurer would have failed to settle the case within the policy limits.” Hartford Cos. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 121 (1994).
Liberty Mutual contends that it did not violate G.L.c. 176D, §3(9)(f) because it relied on trial counsel's advice that there were reasonable grounds upon which to file an appeal. After considering all the relevant factors, this Court concludes that the defendant’s argument is unsupported by the relevant facts and law, and that no reasonable insurer would have failed to recognize its liability at least by February of 1994, when judgment entered following the denial of the post-trial motions.

a. Advice of Counsel

Liberty Mutual argues that because it relied on its trial counsel’s opinion that reasonable grounds existed for appeal, it did not violate G.L.c. 176D, §3(9) (i). While reliance on the advice of counsel constitutes “some evidence” of good faith, the cases that have upheld an advice of counsel defense are factually distinguishable from the case at hand. Hartford Cas. Ins. Co., 417 Mass, at 122, n.5. Insurers have successfully used the reliance on counsel defense in cases where the insurers either based a decision on independent legal advice or, legal advice of its own counsel that was supported by an independent expert opinion. See Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 673-74 (1983) (where the insurer reasonably relied upon the opinion of an experienced trial counsel and a former chief of surgery that liabilify was not clear); Mayer v. Medical Malpractice Joint Underwriting Ass’n, 40 Mass.App.Ct. 266, 274 (1996) (where insurance company’s decision not to settle was reasonably based on the information and advice it received from its counsel, which was grounded in the opinions of three medical experts).
Liberty Mutual’s reliance on advice from Mahanor was unreasonable for a number of reasons. First, Mahanor had no practical appellate experience, as this was his first appellate case. In cases where the courts have found reliance on trial counsel reasonable, the counsel was experienced and was supported by expert opinions or independent legal advice, which is not the case here. Second, Liberty Mutual, in relying on the legal advice of Mahanor, failed to recognize his lack of objectivity in the case. The fact that Mahanor was being paid by Liberty Mutual and had invested a substantial amount of time and energy into the trial should have raised questions about his ability to objectively assess the appellate issues. In addition, Liberty Mutual was well aware of the animosity between opposing counsel during trial and that Mahanor also harbored ill feelings toward Maguire. Any reasonable insurer would recognize that these factors, taken together, indicate that Mahanor had questionable judgment and a personal motive to appeal the case, and any *468 reliance on his unverified and inexperienced advice would be unreasonable. Liberty Mutual’s contention that it reasonably relied on the advice of its home office counsel is also without merit. Skeary’s neutrality concerning the case is called into question because he was an employee of Liberty Mutual. Any insurer would know that it is not reasonable to rely on legal advice provided by an unobjective attorney. Liberty Mutual argues that all Skeaiy needed in order to provide an objective review was the claims file and the trial judge’s post-trial order. I agree. Although in other contexts, a trial transcript would be necessary to effectively evaluate the merits of an appeal here, the only pertinent issue on appeal[6] was whether the trial judge abused his discretion in failing to grant a mistrial on the basis of the evidentiary issues. However, no reasonable insurer relying on the advice of reasonably knowledgeable counsel would have thought there was any chance of prevailing on appeal. The trial judge, in a very thoughtful opinion, explained why these missteps were not overly prejudicial.
Liberty Mutual failed to recognize that Mahanor’s inexperience and lack of objectivity, and Skeaiy’s lack of objectivity and unknown experience on appellate issues, prevented them from giving reliable legal advice. Without supporting legal advice from outside counsel or factual support from experts, Liberty Mutual was unreasonable in relying on the advice of these two attorneys. In these circumstances, reliance on counsel’s advice does not help Liberty Mutual.

b. The Viability of Turner’s Issues on Appeal

The defendant argues that liability does not become reasonably clear when a jury finds for plaintiff or when there is still a good faith disagreement about liability. Clegg, 424 Mass, at 418. While an insurer has a duty to defend an adverse judgment against its insured, it only must do so if reasonable grounds exist that the insured’s interest might be served by the appeal. Davis, 434 Mass, at 180. However, whether there are reasonable grounds to appeal depends upon a reasoned legal assessment of what occurred at trial, including: 1) the rulings and instructions to the jury by the trial judge; 2) the objections and motions by trial counsel; and 3) the state of the law on the points in issue.
In reviewing Liberty Mutual’s decision to appeal, it is important to consider all the relevant factors to determine if it had any reasonable grounds on which to appeal. A consideration is Turner’s admission in its interrogatories that it was responsible for setting up the failed scaffolding that led to Mr. Tallent’s injuries. The importance of this admission is evident in Liberty Mutual’s failure to appeal the amount of damages or fault. As to Turner, on appeal Liberty Mutual only argued that error in the two evidentiary matters should have resulted in a mistrial. It is “relatively rare for evidentiary errors to result in a reversal in a civil action.” Bowlen v. O'Connor Cafe of Worcester, Inc., 50 Mass.App.Ct. 56,67 (2000). Liberty Mutual’s allotment of only a few pages of its thirty-three page appellate brief to the evidentiary issues indicates the lack of importance and strength Liberty Mutual assigned to these issues.
Liberty Mutual’s decision to pursue an appeal was not only based upon unreliable and biased advice, but also it was in contradiction to the advice of its own seasoned employees. One such employee was McCarthy, a Regional Property Specialist who had worked for Liberty Mutual since 1966 and attended the trial for the sole purpose of providing his independent observation and evaluation of the trial developments to Liberty Mutual. As early as September29,1993, he stated that there was little chance of a verdict for Turner. McCarthy also agreed with the trial judge’s rulings on the post-trial motions concerning the effect of the evidentiary issues: despite the violation of the court’s orders, there was no prejudicial impact on the jury. In addition, upon review of the case file on July 19, 1993, Savoie, the Home Office Examiner in charge of obtaining authorization for the settlement of cases, wrote that liability did not look good for Liberty Mutual since Turner may have set up and maintained the staging in question.[7] Furthermore, Cook, an adjuster for Liberty Mutual and a troubleshooter for difficult cases, who became involved in the case after the jury verdict, advised that Liberty Mutual should get on with the settlement negotiations and disagreed with Savoie’s decision to forego a settlement offer to the plaintiffs and to pursue the appeal.
Moreover, Liberty Mutual should have calculated into its assessment of its appellate issues the considerable deference that appellate courts grant to a judge’s disposition of a motion for a new trial, especially where the motion judge was also the trial judge. Gath. v. M/A-Com., Inc., 440 Mass. 482, 492 (2003). An appellate court will only reverse such a ruling for an abuse of discretion. Id. This deference was evident when the Appeals Court issued its memorandum and order for Liberty Mutual’s appeal pursuant to Appeals Court’s Appellate Practice Rule 1:28, which is done when the appeal is either lacking any substantial questions of law or presenting an error so clear as to warrant summaiy disposition.[8] Finally, despite the Rule 1:28 opinion by the Appeals Court, Liberty Mutual forged ahead with its request for further appellate review to the Supreme Judicial Court and the request was appropriately denied.
Liberty Mutual based its decision to pursue an appeal on the unsupported advice of inexperienced and unobjective legal counsel. This, taken in conjunction with: 1) Turner’s admission to liability; 2) Liberty Mutual’s failure to appeal liability; 3) the advice from its seasoned employees to settle the case; and 4) the deference appellate courts give to trial judges in their trial rulings leads me to the conclusion that there were no reasonable grounds on which Liberty Mutual could pursue an appeal and that liability was reasonably clear when the trial court denied the post-trial motions.[9]
*469 2. Chapter 176D, §3(9)(d): Duty to Investigate
An insurer may breach its duly of good faith and fair dealing by refusing to pay claims without conducting a reasonable investigation based upon all available information. G.L.c. 176D, §3(9)(d). This provision or G.L.c. 176D addresses situations where the insurer refuses to pay a claim without attempting to verify its legitimacy. Id.
Liberty Mutual contends that it did not violate G.L.c. 176D, §3(9)(d) because it conducted a reasonable post-trial investigation regarding the viability of its appellate issues. After considering all of the following relevant factors, I conclude that the defendant’s argument is unsupported by the relevant facts and law, and that a reasonable insurance company would have conducted a more thorough investigation into the viability of its appellate issues.
In evaluating whether or not Liberty Mutual conducted a reasonable investigation into the likelihood of success of its appellate arguments, its actions should be measured against the standard in the insurance industry, as explained by expert testimony. I find persuasive Mann’s testimony and opinion, that Liberty Mutual was required to analyze the legal issues objectively to determine if liability and damages were reasonably clear before proceeding with the appeal, and that obtaining the advice of objective appellate counsel for that analysis was a frequent practice in the insurance industry. This is further supported by the credible testimony of Kiriakos, who testified that in supervising and overseeing the claim, the home office should have been concerned about its counsel’s motivation for the appeal and investigated the matter carefully. He further opined that Liberty Mutual did not pursue a reasonable investigation of the merits of its appeal and did not act reasonably in evaluating its legal position on whether liability to the Tallents was reasonably clear.
Liberty Mutual, when presented with contradicting advice about the potential success of its appeal, chose to rely on advice from its unobjective and inexperienced trial counsel rather than seeking a second opinion from an objective and informed counsel. It did seek out the opinion of Skeaiy but he was also in-house counsel and it was unclear how familiar he was with appellate practice. Moreover, this consultation with Skeaiy, more than two and one-half years post-verdict, was too little and too late. In sum, Liberty Mutual breached its duty to the Tallents because it failed to conduct an adequate investigation based upon all available information in determining if it had reasonable grounds for an appeal.
C. Damages
When a plaintiff brings an action under G.L.c. 93A, §9 for a violation of G.L.c. 176D, §3(9), a plaintiff is entitled to recover for all losses that were the foreseeable consequence of the defendant’s unfair or deceptive act or practice. Hopkins, 434 Mass, at 566-67. Under G.L.c. 93A, §9(3) “[RJecovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but no less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purpose of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.”
Chapter 93A, §9(3) “distinguishes between those cases in which a judgment has entered on the underlying claim and those in which no judgment has entered: if the amount of "actual damages" is to be doubled or trebled, and where there has been no judgment on an underlying claim, the base damages are calculated according to the interest lost on the money wrongfully withheld by the insurer, compensating claimants for “the costs and expenses directly resulting from the insurer’s conduct.” R.W Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 82 (2001), citing Kapp v. Arbella Mut. Ins. Co., 426 Mass. 683, 686 (1998); Clegg, 424 Mass, at 425. “If, however, the defendant is subject to multiple damages and the plaintiff has recovered a judgment on the underlying claim actual damages shall be taken to be the amount of the judgment for the purpose of bad faith multiplication.” Id. (internal citations omitted).
The Appeals Court specifically examined the language in G.L.c. 93A, §9(3) that allows the court to double or treble the underlying judgment if bad faith is found. Cohen v. Liberty Mutual Ins. Co., 41 Mass.App.Ct. 748, 753-56 (1996). This provision of c. 93A was added by the Legislature in 1989 in response to the Appeals Court decision, Wallace v. American Mfrs. Mut Ins. Co., 22 Mass.App.Ct. 938 (1986). Id. In Wallace, the court held that when bad faith was found, and there was an underlying judgment, the plaintiff could only recover doubled or trebled damages on the interest of the judgment from the date when the insurer should have settled until the actual date of judgment. Id. The amendment to c. 93A in 1989 responded to this decision and directs the courts to double or treble the underlying judgment, and not simply the lost interest. Id., at 755. However, the court in Cohen further opined that while the amendment changed the amount which was to be multiplied, “[it] did not abolish the need for a plaintiff under c. 93A to show a causal connection between a defendant’s wrongful conduct and the resulting damages.” Id., at 755. The court concludes that in a case where an underlying judgment exceeded a policy limit, the insurer could not be held liable for more than the limits of its policy. Id., at 756.
*470 The Supreme Judicial Court in R.W. Granger also discussed what amount was to be multiplied in a case where there was an underlying judgment and post-verdict bad faith conduct. The court stated that while doubling the underlying verdict may seem excessive in light of the fact that the defendants’ post-verdict conduct only caused the plaintiff to lose the use of the money to which it was entitled, the award is consistent with the intent of the legislature. R. W. Granger, 435 Mass, at 82. “The Legislature directed that where . . . a plaintiff obtains a judgment against an insurer subject to multiple damages because it acted in bad faith in denying reasonable settlement of the plaintiffs underlying claim, the defendant insurer ‘shall be’ subject to ‘multiplication of the judgment secured by the plaintiff on the underlying claim, thereby risking exposure to punitive damages many times greater than multiplication of the lose of use of money alone.’ ” Id., citing Kapp, 426 Mass, at 686.
In this case, Liberty Mutual violated G.L.c. 176D, §3(9) (d) and (f). In addition, there is a judgment in the underlying case. Therefore, the only remaining question is whether the defendant acted in bad faith in making its decision to pursue an appeal rather than pay the judgment once liability became reasonably clear.[10] If the defendant’s decision was made in good faith, then the Tallents are entitled to the interest on the judgment for the period from February 7, 1994 to August 20, 1997. However, if Liberty Mutual’s decision was made in bad faith, the plaintiffs are entitled to double or treble the underlying judgment, plus attorneys fees and costs in pursuing the c. 93A claim.

1. Good Faith or Bad Faith

Whether Liberty Mutual’s failure to offer the Tallents a reasonable settlement proposal after liability was made in bad faith is a question of fact. Parker v. D’Avolio, 40 Mass.App.Ct. 394, 395 (1996). Liberty Mutual has the burden of proving that its refusal to settle was reasonable and made in good faith in light of the demand and attendant circumstances. Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 799 (1976). Liberty Mutual must show that it did not act deliberately to derail the settlement process and that it did not intend to “wear out the claimant by unduly delaying settlement when liability, including causation and damages is clear or highly likely.” Parker, 40 Mass.App.Ct. at 396, citing Miller v. RiskMgmt. Foundation of Harvard Med. Insts., Inc., 36 Mass.App.Ct. 411, 418 (1994); Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 343 (1994).
“An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A-176D action based on unfair settlement practice.” Guity, 36 Mass.App.Ct. at 344, citing Forucci v. United States Fid. & Guar. Co., 817 F.Sup. 195, 202 (D.Mass.), aff'd, 11 F.3d 1 (IstCir. 1993). “Good faith” for purposes of G.L.c. 93A is defined as “the insurer making settlement decisions without regard to the policy limits and the insurer’s ‘exercise of common prudence to discover the facts as to the liability and damages upon which an intelligent decision may be based.’ ” Bolden v. O’Connor Cafe of Worcester, Inc., 50 Mass.App.Ct. 56, 59 n.9 (2000), quoting Hartford Cas. Ins. Co., 417 Mass, at 119.
Bad faith in the context of a Chapter 93A action may be either objective or subjective. Parker, 40 Mass.App.Ct. at 396. “Objective bad faith may be found where a potential defendant offers ‘much less than a case is worth in a situation where liability is either clear or highly likely.’ ” Id., quoting Guity, 36 Mass.App.Ct. at 343. Under the objective bad faith analysis, the key inquiry is whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff. Demeo v. State Farm Mut Auto. Ins. Co., 38 Mass.App.Ct. 955, 956-57 (1995).
Even when an insurer can satisfy the test for objective reasonableness, it may still be liable under c. 93A if the plaintiff can establish that the insurer was motivated by subjective bad faith. Parker, 40 Mass.App.Ct. at 396. “Subjective bad faith may be established by direct evidence that a defendant was ‘motivated by subjective bad faith’ even where ‘on an objective standard of reasonableness’ he “would have been warranted in not settling a case.’ ” Parker, 40 Mass.App.Ct. at 396, citing Hartford Cas. Ins. Co., 417 Mass, at 123. A good faith reasonable position by an insurer, even if incorrect, is not a c. 93A/c. 176D violation. Peckham v. Continental Casualty, 895 F.2d 830, 833 (1st. Cir. 1990). “An insurer is not held to standards of omniscience or perfection; it has leeway to use and should consistently employ its honest business judgment.” Id. at 835.
As stated previously, I find that liability was reasonably clear after the trial judge denied the defendant’s post-trial motions. Therefore, in determining whether Liberty Mutual objectively acted in bad faith, this court must consider if its post-trial settlement offers were much less than the case was worth. Parker, 40 Mass.App.Ct. at 396. The post-trial motions were decided in February 1994, and the first post-trial settlement negotiations began in the spring of 1994. At the time Maguire was attempting to negotiate a settlement agreement, McCarthy informed Liberty Mutual that he had no confidence that Turner would prevail in the appeal and advised a settlement. However, Liberty Mutual made no settlement offer at that time.
In the fall of 1994, Maguire attempted to negotiate another round of settlement talks. At this time, the value of the judgment was $2.16 million. Cook recommended that Liberty Mutual should settle the case and that a new trial might well be a pyrrhic victory. Even if the jury awarded the Tallents less, there would be additional legal fees, and additional interest added to the judgment. Despite the advice from McCarthy and Cook, Savoie denied Cook the authority to settle the claim. He based this decision on advice he received *471 from Mahanor whose advice, as previously discussed, was unreliable because of his inexperience and lack of objectivity. On December 7, 1994 Cook let Maguire know that there would be no offer to settle.
Both parties filed appellate briefs by January of 1996. On January 26, 1996, Maguire wrote a demand letter to Liberty Mutual pursuant to G.L.c. 93A, §9 and G.L.c. 176D, §3(9)(b), (c), and(f). Liberty Mutual responded through LaCasse that there had been no violations of Chapter 93A and the original demand letter was insufficient because it failed to state injuries. No settlement offer was made at this time.
Finally, on May 13, 1996, more than two years after liability had become dear, Liberty Mutual made the Tallents a settlement offer that had a then present day value between $500,000 and $600,000, which was less than one-half of the interest that had accrued on the jury award. The Tallents rightfully rej ected this offer. After the oral arguments in the Appeals Court, Liberty Mutual had a standing offer of $1.4 million. Considering the strength of their oral arguments, and the fact that the jury award was now worth $2.8 million, the Tallents did not consider this a reasonable offer and refused it. At this time, Hopkins, the person who replaced McCarthy in the case, advised Liberty Mutual to increase its offer; however, Liberty Mutual refused.
I conclude that Liberty Mutual obj ectively acted in bad faith when it failed to offer the Tallents the judgment amount after liability became clear. The defendants withheld all settlement offers for two years after liability became dear. The only explanation the defendants offer this Court is that they relied on counsel’s advice that it had viable appellate issues. I have already determined that no reasonable insurance company would have relied upon an inexperienced trial counsel's advice without further investigation and support of his opinion. In addition, considering the growing value of the judgment and the weakness of Liberty Mutual’s appellate issues, the settlement offers that were eventually made to the Tallents were well below the value of the case. Therefore, Liberty Mutual’s failure to offer the Tallents the amount of the judgment or at least a timely and reasonable settlement offer was done in bad faith. In my view, Liberty Mutual used the appellate process in an attempt to extort the Tallents into a settlement for far less then they were owed.
Liberty Mutual’s argument that it made a subjective good faith decision to pursue an appeal after post-trial motions is equally unpersuasive. In order to prove that it made a subjective good faith decision to appeal, Liberty Mutual must show that it made an honest business judgment. Peckham, 895 F.2d at 835. However, there is no evidence that Liberty Mutual made an honest business judgment to appeal.
The animosity between opposing counsel in the underlying action was evident and permeated the appellate decisions. The hostility was so severe that DuLaurence and Maguire did not speak to each other, and at one point Maguire filed an application for a temporary restraining order against DuLaurence. As stated earlier, Liberty Mutual was also aware that Mahanor harbored feelings of hostility toward Maguire. In addition, in a memo from Mahanor to McCarthy, dated February 2, 1994, Mahanor outlined what he believed to be the grounds for appeal stating “[b]y taking an appeal of the denial of these [post-trial] motions, it may make counsel for the plaintiffs more amenable towards any potential settlement negotiations.”
As previously discussed, McCarthy and Cook advised Liberty Mutual to settle the case with the Tallents. This advice led Savoie to ask Liberty Mutual’s legal office if it could settle with the Tallents and still appeal indemnification issues. However, he never requested this advice until May 11, 1995, over a year after liability was clear. Savoie even testified that the principal motivation for the appeal was to get the subcontractors to pay all or part of the Tallents’ damages. This is supported by the limited number of pages Liberty Mutual allotted in its appellate brief to the evidentiary issues.
Liberty Mutual was incapable of making an honest business judgment because it blatantly ignored, and failed to address, the facts indicating that Mahanor and DuLaurence had bad faith motives for pursuing an appeal. It is clear that part of the purpose of the appeal was to put the Tallents in a position where they would be more likely to settle for much less than the verdict with interest, as evident by the subsequent “low-ball” offers. In addition, it appears that Liberty Mutual’s primary concern on appeal was to secure contribution toward the judgment from other companies that were involved in the accident, and it was not protecting the interests of its client, Turner. Liberty Mutual failed to pursue a reasonable and timely investigation of the merits of its appeal and ignored essential factors that were necessary in making an honest business judgment. Its consultation with Ske-ary presented Liberty Mutual with another opportunity to make a fair and equitable offer (albeit not prompt) to settle or to pay the judgment. This consultation lacked the requisite independence and it was incomplete and too late. Liberty Mutual has presented no evidence that it attempted to act in a manner consistent with making an honest business judgment. Even under a subjective analysis, Liberty Mutual’s decision to pursue an appeal was done in bad faith.

2. Calculating Damages

I do not conclude that the conduct of Liberty Mutual was sufficiently egregious to warrant treble damages. However, since I have concluded that Liberty Mutual acted in bad faith in pursuing the appeal the amount of the judgment issued on February 7, 1994, $2,050,344 shall be doubled for a total of $4,100,688. I note that had Liberty Mutual not acted in bad faith the Tallents’ damages would be the loss of use of the February 7, 1994 judgment from that date until they were paid on August 20, 1997. See Yeagle v. Aetna *472 Casualty & Surety Company, 42 Mass.App.Ct. 650, 653-56 (1997). Under single c. 93A damages, the total amount of the Tallents’ loss of the use of the money would have been $111,237.00.[11]

ORDER FOR JUDGMENT

It is therefore ORDERED that judgment enter for the plaintiff in the amount of $4,100,688.00[12] against the defendant Liberty Mutual. Counsel for the Tallents shall submit an itemized bill of attorneys fees in pursuing the c. 93A action. Defense counsel shall have fourteen days to respond to the plaintiffs’ submission.

As to this latter figure, Small provided all of the necessary figures to perform the calculation but did not actually do the final math on the essential figures.

For reasons which follow herein, I find that February 7, 1994, was the outside date on which liability was reasonably clear.

Although the Tallents’ first demand letter states that Liberty Mutual’s failure to pay the judgment on the underlying claim was a violation of G.L.c. 176D, §3(a), (b), (c) and (f), the case was based on alleged violations of (d) and (f) only. The reference to the failure to investigate was addressed in Maguire’s letter of March 19, 1996 although not by specific statutory reference. See Cohen v. Liberty Mutual Insurance Co., 41 Mass.App.Ct. 748, 756 (1996); Piccuirro v. Gaitenby, 20 Mass.App.Ct. 286, 292 (1985). Moreover, the plaintiffs’ proposed request for rulings addresses only violations of (d) and (f). Consequently, alleged violations of (a) (b) and (c) are waived.

The Tallents also sent the defendant a second demand letter on February 2, 2000, which asserted a new injury of emotional distress and the legal fees for the appeal. However, a c. 93A demand letter cannot be supplemented after the plaintiff has filed the claim, without amending the complaint. Medeiros v. Woburn Nursing Center, Inc., 2001 WL 1174141 (Mass.Super. 2001) (13 Mass. L. Rptr. 555); see also Hobbs v. Carroll, 34 Mass App.Ct. 951, 952 (1993).Thee. 93A claim in this case was filed on April 4,1997. The second demand letter was mailed on February 2, 2000, and there is no record of a motion to amend or allowance of such a motion to amend the original complaint. Thus, the second letter of February 2, 2000 does not legally supplement the original demand of the plaintiff.

At trial and his written comments in a written memo to Savoie, Skeary conceded that, in his opinion, the verdict was not against the weight of the evidence.

In fact, Turner made this admission in its answer to interrogatories.

Appeals Court’s Appellate Practice Rule 1:28. “[A] panel of the justices of this court may determine that no substantial question of law is presented by the appeal or that some clear error of law has been committed which has injuriously affected the substantial rights of an appellant and may, by its written order, affirm, modify or reverse the action of the court below.”

This Court recognizes the need to balance the desirability of settlement post-verdict with the danger of stifling the appellate process. In some cases there is a fine line between the two. However, given the lack of merit to the appellate issues here, no reasonable insurers would have failed to offer a fair, prompt and equitable settlement or to pay the amount of the judgment. Moreover, c. 176D imposes duties on insurance companies that are not applicable to individual defendants. Thus, where an individual defendant may be subject to a claim that his appeal is frivolous, the standard and the duties are heightened for insurance companies because of c. 176D.

I note that Liberty Mutual never made a prompt, fair and equitable offer to settle for less than the judgment. Since no such offer was forthcoming, I do not address the question whether a prompt, fair and equitable settlement offer in these circumstances could have been something less than the amount of the judgment on February 7, 1994.

 Nhe Tallents were awarded interest for this period of time at the statutory rate of 12%. As a base for the amount that would have been invested by the Tallents, I have utilized what they actually invested, $1.1 million. To this figure, I have calculated interest for the applicable period at a rate of 14.87% which represents an average return on the most conservative portfolio investment of 50% in stocks and 50% in government bonds. I then subtracted what they were paid at the 12% statutory interest from 14.87% interest.

Since the complaint was filed on April 4, 1997, the Tallents are entitled to interest on the judgment at a rate of 12%. G.L.c. 231, §6B. The Clerk is directed to calculate the interest on the judgment at this rate of 12% through March 10, 2003.
Since the matter has been under advisement beyond the one hundred and twenty days permitted for matters under advisement, G.L.c. 220, §14A, the interest rate to be applied from March 11, 2000 through the date judgment issues is 5.41%, which is 1% above the average prime rate for the period of time. See The Wail Street Journal (where the prime rate is calculated on a historical basis). A summary of the historical data is attached as Addendum A. The defendant should not be penalized with 12% interest for this period nor should the plaintiffs be deprived of the loss of use of the money due to the delay in rendering the opinion.
ADDENDUM A AVERAGE PRIME RATE MARCH 11, 2003-APRIL 22, 2005
PRIME DAYS
DATES DAYS RATE *PR
March 11, 2003- 108 4.25 459.00
June 26, 2003
June 27,2003- 370 4.00 1,480.00
June 30, 2004
July 1,2004 - 41 4.25 174.25
August 10, 2004
August 11,2004- 41 4.50 184.50
Sept 20, 2004
Sept. 21,2004- 51 4.75 242.25
Nov. 10, 2004
Nov. 11,2004- 34 5.00 170.00
Dec. 14, 2004
Dec. 15,2004 - 50 5.25 262.50
Feb. 2, 2005
Feb. 3,2005 - 47 5.50 258.50
March 21, 2005
March 22,2005 - 32 5.75 184.00
April 22, 2005
TOTALS 774 3,415.00
TOTAL DAYS IN TIME PERIOD 774
AVERAGE PRIME RATE FOR TIME PERIOD 4.41
Notes to Addendum:
1. March 11, 2003 represents 120 days from November 20, 2002.
2. The Prime Rates for each relevant time frame were obtained from a table listing historical data for the prime rate.