Tucker, Richard T., J.
This matter came on for trial, without jury, on November 24, November 25, and November 26, 2008. After hearing and observing all witnesses, consideration of the more than forty numbered exhibits entered into evidence (some containing hundreds of pages) and receiving the oral and written argument of counsel, this Court makes the following Findings and Rulings.
FINDINGS OF FACT
On February 16, 2003 at approximately 1:30 a.m. a motor vehicle accident occurred in the westbound lane of the Massachusetts Turnpike in Framingham, Massachusetts. The plaintiff, Pierre Sterlin (“Pierre” or plaintiff), was a passenger in the rear seat of an Acura sedan operated by his brother Sers Sterlin. The wife of Sers, Rose Sterlin, occupied the front passenger seat.
Traveling in the same westbound direction on the Massachusetts Turnpike, the defendant Sagar Patel (“Sagar” or defendant) was operating the motor vehicle of his father, Mukesh Patel. Sagar was operating the vehicle with the permission of his father. On February 16,2003 Mukesh Patel’s vehicle, an Infiniti sedan, was insured by the defendant, Commerce Insurance Company (“Commerce”). The liability insurance of said vehicle was a $500,000 “combined single limit benefit” meaning there was a total of $500,000 in liability coverage available for any and all parties injured in an accident.
At approximately 1:30 a.m. Sagar, while changing lanes, and having probably fallen asleep, made contact with the Sterlin vehicle causing that vehicle to spin and roll over several times. As a result of this contact *125 and rollover all three occupants in the Sterlin vehicle were injured.
Sagar, having come to a stop after witnessing the Sterlin vehicle rolling out of control, made an Emergency 911 telephone call and stated to the dispatcher of the State Police that “I fell asleep at the wheel and I just hit some people and they are bleeding!” When the State Police arrived at the scene of the accident Sagar informed them again that he had fallen asleep and the trooper on the scene included that statement in his police report. As a result, Sagar was charged with operating to endanger and failure to operate within marked lanes.
Pierre, who was asleep at the time of the accident, was injured seriously, most specifically receiving a degloving injuiy to his right dominant hand with various fractures of his hand, fingers and wrist. He was taken by life flight helicopter to the University of Massachusetts Medical Center where he remained for sixteen (16) days through March 4, 2003. During this stay he underwent three surgeries in an attempt to save and reconstruct his hand. His thumb of his right hand required amputation and thereafter he underwent bone fixation by the placement of pins, and further debridement. He was thereafter discharged to his home where he received home nursing that continued into the summer months. He later had a fourth surgery for removal of pins, further grafting, and the amputation of his pinky finger and reattachment in his former thumb’s position of his dominant hand.
The day after the accident on February 17, 2003, this incident was reported to Commerce by phone by the owner of the Patel vehicle, Sagar’s father, Mukesh Patel. In said conversation, Mukesh Patel revealed his understanding that his son had lost control of the vehicle on the Massachusetts Turnpike and caused another car to roll over. He further informed Commerce that the State Police, Western Barracks, was investigating this incident. This report of Mukesh Patel of the accident is recorded in a summary note of Cheryl Nutthall of Commerce dated February 20, 2003.
In addition to the very serious injuries that the plaintiff was forced to deal with following February 16, 2003, his financial situation presented additional, enormous hurdles. As he could not work he lost his job and his medical insurance. His wife also lost her job and therefore it was crucial for his continued treatments that the plaintiff be able to make payments for continued medical coverage under the COBRA law. As a result of his dire financial straits he received over time funds from his church, his sister, his friends and family and exhausted his savings, as well as all available funds from his credit cards. By July of 2003, he had no available funds left and, with the help of his attorney Robert Canty, he entered into a loan arrangement “against his lawsuit” from an out-of-state lender. In this manner he was able to borrow $20,000 during the summer of 2003.
Robert Canty, Esquire began representing Pierre in regard to his personal injuiy claim on February 19, 2003. Rose and Sers Sterlin, both of whom received injuries in the accident became represented by R. Michael Brown, Esquire. Both counsel advised Commerce of their representation of their clients on March 4 or 5, 2003.
After receiving the report of accident by Mukesh Patel on February 17, 2003, and the letters of representation of the claimants in early March 2003, the file was assigned to a Senior Claims Adjuster of Commerce, Donata Gago (“Gago”). On March 11, 2003 Gago received from Attorney Brown a copy of the State Police report and the Trooper’s understanding as well as Attorney Brown’s clients’ version of the accident that Patel had fallen asleep, crossed over into the lane of the Sterlin vehicle causing the Sterlin vehicle to roll over and come to a stop in the center travel lane. Attorney Brown also advised Gago that Rose Sterlin suffered a fractured vertebrae at L-l, a fracture of her pelvis and that she was admitted to the University of Massachusetts Medical Center where she was treated for a week. Thereafter Attorney Brown informed Gago that Rose Sterlin required two weeks of confinement in a body cast at Fairlawn Rehabilitation Hospital after which she was discharged in a body brace to her home for home nursing care. Gago also learned on or about April 10, 2003 that Sers Sterlin had received a shoulder injuiy as well as injuries to his head, neck, left wrist and hand. Sers’s medical bills to that date totaled $16,000 and it appeared that he would be unable to perform his employment as a mechanic for the foreseeable future.
On April 9, 2003 Sagar was present in court for a show cause hearing regarding charges stemming from the accident. The clerk magistrate who conducted this hearing determined that a criminal complaint would issue against Sagar.
By March 11, 2003 Pierre had incurred over $78,000 in medical bills which Attorney Canty forwarded to Gago. Reserves were set by Commerce on or about April 10, 2003 of $250,000 for the plaintiffs claim, $150,000 for Rose Sterlin’s claim and $50,000 for Sers Sterlin’s claim. Thus, as of April 10, 2003 Commerce knew that it was likely that approximately the total liability benefit of $500,000 would be necessary to adjust the claims of the three injured parties.
Gago, however, still believed that the liability of Commerce’s insured, Sagar, was not clear despite the statements attributed to him indicating his liability made during the Emergency 911 phone call from the scene, statements to the troopers at the scene, statements apparently made by Sagar to his father and Attorney Brown’s statements of his clients’ version of the events. A telephone interview of the insured, Sagar, was therefore scheduled by Gago to be held on April 17, 2003. Prior to conducting this interview Sagar submitted his Operator’s Report to Commerce in *126 which he does not admit to contact between the two vehicles. In this report Sagar indicated he had witnessed the crash and then called 911. He makes no explanation of the statements attributed to him by the troopers, the Emergency 911 call or his father’s statement in reporting the accident to Commerce. He also does not explain why, if there was no contact, the police had his vehicle towed from the scene.[1]
The interview of Sagar was taken on April 17, 2003 by telephone. Gago conducted the interview and recorded the same with Sagar’s permission. At all times Sagar’s lawyer representing him in the pending criminal action was present and, at times, this lawyer also made statements. In this interview Gago never asked Sagar whether he fell asleep at the wheel. She never asked him whether he admitted falling asleep during his Emergency 911 telephone call nor did she ask him whether he made a similar statement to the troopers who came to the scene. At the time of the interview Commerce had not taken any steps to photograph the vehicle that Sagar was operating despite the fact that it had been towed from the scene by the State Police. Gago indicated during this interview that she was going to assign the vehicle to be “looked at” and for photos, despite the fact that Sagar had just told her that since the date of the incident his car had been fully repaired. In response to Gago’s question about whether “there was any contact between your vehicle and that other car?,” Sagar stated “I don’t know.” Later in the interview when Gago asked the leading question “so to the best of your recollection there was no contact between your vehicle and the other car?,” Sagar responded “I do not believe so.” Commerce did not have this interview transcribed until September 4, 2003. Instead, Commerce’s internal files contained the summary of the interview by Gago. She stated in her summary that “insured said there was no contact between his car and the OV (other vehicle).” She also stated that “he knows that he did not hit the OV.” Gago did not set forth in her summary that Sagar had been cited for his operation of the motor vehicle, that he had appeared in court once and that his next scheduled hearing for arraignment was May 23, 2003. Gago compounded her misstatements in her summary of Sagar’s reported lack of knowledge as to any contact between the vehicles after she received photographs of the Patel vehicle in its repaired state. She entered in Commerce’s internal files on May 5, 2003 that she “rec’d damage photo, there was no damage on insured’s vehicle, therefore that supports insured’s statement that there was no contact between the insured’s and clmt’s car.” In this regard Gago had no explanation which she revealed in the file notes or testimony at trial as to why the state troopers would have had Sagar’s car towed from the scene, or that Mukesh Patel would have even reported the accident if in fact there had been no contact between the vehicles. Her explanation at trial as to why she did not confront Patel directly with these allegations including that he had fallen asleep at the wheel was that she “wanted to obtain information directly from him.”
Attorney Canty forwarded to Commerce on May 8, 2003 329 pages of medical records regarding the ongoing treatment of the plaintiff. These supplemented the copies of the medical bills and charges that he had forwarded to Commerce on April 11, 2003. During a telephone conversation with Attorney Canty on May 19, 2003, Gago informed plaintiffs counsel that the liability portion of their investigation was still not concluded since Patel had a different version of the events than the parties in the Sterlin vehicle, the Emergency 911 telephone call and the police report.
By May 23, 2003, Commerce Supervisor, Robert Marchewka was questioning in the file “why the delay in insured reporting? specifically what will be done to complete the liability investigation?” Manager, James Rohr on May 28, 2003 made a file note questioning their insured’s version of the events. Rohr stated “the insured version appears that there might be a story developed to overcome the citations, but at this point we are missing the police officer and OV operator’s version.” At that time Commerce had yet to seek statements from either the troopers at the scene or the other operator, Sers Sterlin. Rohr went on to state that they needed to speak with Sers Sterlin and to the troopers. He also raised the question of whether or not they could obtain photos of the Sterlin vehicle.
At this time, in regard to the other two claimants, Rose and Sers Sterlin, Attoney R. Michael Brown wrote to Gago on May 27, 2003 that in his view the liability was one hundred percent on Sagar, that Sagar fell asleep at the wheel and drifted over the line, that he admitted fault at the scene to the troopers and that he had been charged criminally. Attorney Brown concluded by stating that liability is clear and that for Commerce to question liability now is “untenable.” While describing his own client’s injuries and severe financial problems, Attorney Brown opined that the plaintiff, Pierre Sterlin’s “injuries are horrendous.” Attorney Brown advised Commerce that it should pay out the $500,000 in available liability benefits to the three claimants and allow them to equitably divide this amount among themselves.
By letter dated May 28, 2003, Attorney Canty forwarded to Commerce a demand notice pursuant to Mass. G.L.c. 93A containing a written demand for relief. Attorney Canty also enclosed additional medical bills and records (Pierre’s medical bills totaled $85,000 at that time), the crash report, the police report, tax returns of the claimant Pierre and correspondence that had been exchanged with Mr. Yuen of Commerce regarding medical payments benefits. In his demand letter, Attorney Canty reviewed the facts concerning the accident of February 16, 2003 and Pierre’s resulting injuries. In arguing that the liability of Commerce’s insured, Sagar, had been reasonably clear for an extended period of time, Attorney Canty alleged that *127 Commerce violated both Mass. G.L.c. 93A and 176D in handling this claim by “failing to promptly, independently and reasonably investigate the bodily injury claim.” A demand was made for the policy limits of $505,000 to settle Pierre’s claims against Commerce. Mr. Canty also proposed an alternative settlement in which Pierre would accept the payment of the $5,000 medical payments benefits and an advance of $30,000 against his bodily injuiy claim with the remaining policy limits of $470,000 to be paid into court to be apportioned equitably to the three claimants. Additionally in this letter Attorney Canty again advised Commerce of the severe financial difficulties that the plaintiff was facing, including the necessity of paying his medical insurance COBRA payments so that he might continue to receive necessary treatment for his injuries. The following day, May 29, 2003, Attorney Canty forwarded additional medical records and updates of his client’s treatment up to and through the date of May 6, 2003.
Commerce responded to the plaintiffs demands for relief under Mass. G.L.c. 93A and c. 176D, first by letter of Simon Yuen dated June 23,2003. Yuen denied any impropriety of Commerce’s handling of the medical payments benefits claims. He explained that the $5,000 benefits has been paid directly to UMass Memorial Hospital, apparently in nonconformity with the direction that Attorney Canty had previously made that the benefits be paid directly to him or his client so that they could be applied to fund COBRA payments.
In regard to the demands made for the payment of full liability benefits, Gago responded on behalf of Commerce by denying any statutory violation on its part and stating that no offer of settlement could be made because “the result of the charges against their insured have not been decided and at this time liability is not reasonably clear.”
Following this exchange of demand and response letters, Attorney Canty sent an amendment to his demand letter by letter of July 3, 2003 which specifically alleged that Commerce had violated Mass. G.L.c. 176D, §3(9)(f) by failing to make a “prompt” offer of a fair and equitable settlement once “liability has become reasonably clear.” Additionally, he enclosed in that demand letter the case of Lane v. Commerce Ins. Co., a Superior Court decision decided May 8, 2003 [16 Mass. L. Rptr. 295]. Attorney Canty indicated that the Lane decision was instructive as to his client’s claim. To this amended demand, Gago responded by letter of July 30, 2003 stating that “[a]t the present time we are continuing to investigate liability in the above-captioned loss. Our insured denies stating that he had fallen asleep. Based on our investigation to date, it is our opinion that liability has not become reasonably clear in this matter. Therefore we are unable to present a settlement offer to your client.”
As a result of the demand letters Commerce supervisors, William Grey and Robert Marchewka, suggested that a private investigator, John LaJoie be retained to speak to the state troopers and obtain a copy of the tape of the Emergency 911 statement of Sagar. A specific engagement of LaJoie was made on July 29, 2003 for these purposes. LaJoie expressed the initial belief that he did not think the troopers would speak to him with an ongoing criminal action pending against their insured, but that he would try to obtain a copy of the 911 tape with a Freedom of Information Act request. There is no record of Commerce or LaJoie ever making any attempt to speak to the troopers that came to the scene of the accident.
On August 7, 2003, Gago received an email from Commerce’s legal counsel’s office who, upon receipt of the file, immediately questioned why the insured’s car was towed from the scene if it was the insured’s position that there had been no contact and consequently no damage. Gago assured the counsel that they had photos of the insured’s car (i.e. the post-repair photos) and that there was no damage and thus no contact between the insured and the claimant’s vehicle.
On August 8, 2003 Gago had phone conversations with Attorney Canty who inquired as to when Commerce’s liability investigation would be completed. She advised that the liability issue was still under investigation. Canty took steps to have forwarded to Gago on that date his PowerPoint slide show which depicted graphically Pierre’s injuries. Also on that date, Carole Elwell was assigned to replace Gago in the handling of plaintiffs claim by Commerce. At that time no offers of settlement had been made. Commerce had not received any photos of their insured’s post-accident, but pre-repaired, vehicle. The Emergency 911 tape had not been obtained, no statement of the operator or other occupant of the Sterlin vehicle had been obtained, no one had discussed the accident with the troopers at the scene, no one had followed up with Mukesh Patel as to his original statement of liability on the part of his son when he provided notice of the accident to Commerce and there had been no follow-up with their insured relative to the statements he had allegedly made to both the troopers and in his 911 Emergency call concerning his own responsibility. Additionally the summary of Sagar’s statement authored by Gago was inadequate and provided misleading information. Lastly, Commerce had not sent a representative to Sagar’s court hearings nor sought to contact the Assistant District Attorney who was prosecuting the case.
On August 26, 2003 Commerce obtained a copy of the Emergency 911 tape. After hearing Sagar state therein that “I fell asleep at the wheel and hit some people and they are bleeding,” Commerce, through William Grey, “set the liability at 75% against the INSD at this time. We feel that the clmt operator is also at *128 fault and we will pursue them for contribution for the two passengers in the other car.” In his August 26, 2003 notepad summary where he makes this statement, William Grey sets forth no basis upon which Commerce believed that the other operator, Mukesh Patel was contributory of the accident by twenty-five percent. Asked at trial a number of times to state her understanding of the basis for believing that Sers Sterlin could be found to be 25% liable for the accident, Gago repeated that Commerce made an “assumption” and “that was our conclusion.” Newly on the scene, Carole Elwell, for her part, listened to the 911 tape and queried why their insured’s vehicle would have been towed by the police if there had been no damage.
On September 8, 2003 Carole Elwell received a call from Commerce’s legal counsel who advised that on September 5, 2003 Sagar had admitted to sufficient facts on his criminal charges “so basically he admitted he caused the accident. . On September 16, 2003 James Rohr, noted in the Commerce file that “our insured was apparently contriving an accident version in order to escape from the criminal charges. He has now admitted to sufficient facts in his criminal hearing and has essentially admitted to causing the accident. The 911 tape pretty much sealed the deal ...” Rohr suggests in that note that the entire $500,000 liability benefits limits be reserved in recognition of “the potential exposure for the three claims combined.” On November 4, 2003 Carole Elwell requested authority to offer the $500,000 policy limit to settle the cases of the three claimants. Rohr responded on November 6,2003 that he had “obtained authority to offer the 500K policy limits on this case to settle the three claims against our insured on the condition that our insured and CIC will be released from all claims by all claimants. The strategy to ask the court to divide the money is a good option, but before we go this route we need a release of the insured and CIC. We do not want to pay the money to the court without this consideration.” The offer of Commerce to pay over the total benefits of $500,000 to be divided among the three claimants in exchange for the releases of Mukesh Patel, Sagar and Commerce was conveyed to Attorneys Canty and Brown on November 14, 2003. The day preceding, on November 13,2003, Attorney Canty had served upon Commerce an amended complaint which sought damages against Sagar Patel and Mukesh Patel for the personal injuries sustained by Pierre, as well as damages from Commerce for their unfair settlement practices as prohibited by G.L.c. 176D and c. 93A.
Carole Elwell informed the attorneys for the three claimants on November 14, 2003, that Commerce was willing to pay over the total $500,000 of liability benefits to be divided among the claimants in return for full releases of their insured (Mukesh Patel), the operator (Sagar) and Commerce.
James Rohr reversed his position and on December 5, 2003 informed Elwell that Commerce would no longer insist that Commerce be released in the settlement because “[although I would like all matters to be closed to include the 93A on further contemplation I don’t want CIC’s interests to be tied up with the insured’s.”
On December 5, 2003 Carole Elwell, Senior Litigation/OTA Consultant of Commerce Insurance Company made an offer in writing to Attorneys Canty and Brown of a “global settlement to your clients in the amount of the policy limit of $500,000 in exchange for release of all parties.” This offer was made “with the expectation that the three injured parties will reach an agreement among themselves regarding how the settlement funds will be divided.” Although the offer was unclear when it referred to “a release of all parties,” James Rohr’s notepad summaries of that date clarified that “my point concerning dropping the 93A as a condition of settlement was to do so only if that specific issue was an impediment to settling the case. In general we should seek to conclude all claims and settlement with the plaintiff.” On December 11, 2003 Attorney Canty inquired in a telephone call to Elwell whether the proposed settlement required a release of Commerce also. Her notepad summary of that date indicates that she left Attorney Canty a message stating that “while we would like to release Commerce, our offer is not contingent upon a release of Commerce.”
The party claimants, Pierre, Sers and Rose Sterlin had difficulty in resolving their claims for the division of the liability benefits that was tendered by Commerce on December 5, 2003, conditioned upon Commerce’s release and without this condition on December 11, 2003. It was not until September 2, 2004 that payments were finally made to the three claimants exhausting these benefits. In the final agreed distribution, the plaintiff, Pierre Sterlin, received $275,000 of the settlement proceeds.
LEGAL RULINGS AND DISCUSSION Liability
General Laws Chapter 176D was enacted to deter, among other things, unfair settlement practices within the insurance industry. Its provisions are actionable through G.L.c. 93A, the Massachusetts Consumer Protection Act. G.L.c. 176D, §3 sets forth various actions which are defined as “unfair or deceptive acts or practices in the business of insurance” and therefore, violations of G.L.c. 93A. At issue in this case is whether Commerce violated G.L.c. 176D, §3 which sets forth as an unfair claims settlements practice an insurer’s “failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” G.L.c. 176D, §3(9)(f).
Plaintiff alleges that Commerce failed to make a prompt offer of settlement once “liability has become reasonably clear.” The use of the term “liability” in this phrase “encompasses both fault and damages.” Clegg v. Butler, 424 Mass. 413, 421 (1997); Metropolitan *129 Property & Casualty Insurance Company v. Ghoukas, 47 Mass.App.Ct. 196, 199 (1999).
Commerce, in investigating and attempting to adjust plaintiffs claim for the payment of bodily injury liability coverage benefits of its insured, Sagar, was deficient and protracted in a number of different ways and for various reasons. Commerce failed to interview parties and persons with knowledge of the facts of the accident. Specifically, Commerce failed to interview the State Troopers who arrived at the scene, Sagar’s father Mukesh Patel, any of the persons in the Sterlin vehicle, the emergency medical responders, or the Assistant District Attorney prosecuting Sagar. Commerce failed to take any photographs of the insured’s vehicle until after all of the damage had been repaired. Inexplicably Gago reported to her supervisors that the photographs of the repaired vehicle supported Sagar’s claim that no contact between the vehicles occurred. In addition to failing to photograph the insured’s vehicle, Commerce lost the opportunity, by not requesting of Sagar or Mukesh Patel to delay the repairs of the vehicle, of making any meaningful forensic examination of the Patel vehicle.
More telling, however, of the inadequacy of the investigation and the handling of the claims involved by Commerce was its failure to give credit and weight to readily available information related to the question of the fault or liability for the accident. Commerce never questioned Sagar’s father, Mukesh Patel, about his report to Commerce on the day after the accident that his son Sagar had lost control of the vehicle he was operating causing the accident. Commerce failed to give any credence to the Trooper’s statement in the State Police Report that in fact Sagar had fallen asleep at the wheel. Most glaring is Commerce’s failure to obtain the Emergency 911 tape of Sagar’s report of the accident to the State Police moments after the collision, wherein he stated to the operator, “I. . . ah . . . I fell asleep at the wheel and I just hit some people and they are bleeding!”
The above failures by Commerce were not due to any great difficulty in analysis or in accident reconstruction. Commerce, for whatever reason, repeatedly failed to take advantage of and to consider objectively the readily available evidence of the occurrence of the collision.
When Commerce belatedly took the statement of its insured on April 17, 2003, its Senior Claims Adjuster Gago took it over the phone instead of in person, thereby having no opportunity to assess Sagar’s demeanor. She failed miserably in conducting a meaningful interview. Not only did she not ask Sagar whether he had in fact fallen asleep at the wheel or whether he had failed to operate his vehicle within marked lanes for which he was charged criminally, she led him by her questioning to, in substance, agree with her that no contact had occurred between the Patel and Sterlin vehicles. Gago then compounded her errors by failing to have the recording of the interview transcribed and instead distributing her own summary of the statement. Her summary was not merely uninformative, it was misleading in a number of respects, including her reporting that the insured confirmed that there was no contact between his vehicle and the Sterlin vehicle and that he “knows that he did not hit the OV (other vehicle).” Gago also provided erroneous misleading information to the Commerce file when she received the photos of the repaired Patel vehicle which she reported “supports insured’s statement that there was no contact between the insured and clmt’s car.”
Commerce, at all times relevant, had an obligation to conduct a prompt and reasonable investigation based upon all the available information. G.L.c. 176D, §§3(9)(c) and 3(9)(d). Commerce failed to do this in many respects. Instead Commerce’s investigation was misleading and was blind to the evidence and factual material that was available. I find that Commerce violated both of these provisions of G.L.c. 176D by its failure to make a prompt and reasonable investigation based upon the available information.
This Court concludes that liability, including questions of injuries and damages sustained by Pierre, was reasonably clear by at least the date of plaintiffs amended demand letter, July 3, 2003. Although approximately five months (February 17 to July 3, 2003) might not be deemed to be an extremely long time to investigate and adjust a motor vehicle accident with three claimants sustaining serious injuries, in this case, due to the fact that Commerce was in essence closing its eyes to the available evidence, this period was more than sufficient. Despite the accumulated evidence indicating Sagar’s responsibility for the accident, the stated opinions of both attorneys Canty and Brown that liability could no longer be questioned and the questions being raised by some within Commerce as to the progress and direction of the investigation,[2] Commerce, in July 2003, was not budging from its stance that liability could not yet be established. Even upon the belated receipt of the copy of the Emergency 911 tape in which Sagar admitted falling asleep at the wheel and hitting some people who were injured, Commerce continued to cling to the idea that they could make a case for comparative negligence against Sers Sterlin despite absolutely no evidence of fault on the part of Sers. In similar fashion, upon notice that on September 5, 2003, Sagar had admitted to sufficient facts on the criminal charges which meant that “basically he admitted he caused the accident . . . ,” Commerce resisted offering the full policy limits unless Commerce itself could also receive a release for its own liability by the payment of its insured’s benefits. This court is of the belief that such an action on Commerce’s part is, in itself, also an unfair settlement practice and an unfair or deceptive act or practice *130 prohibited by the Massachusetts Consumer Protection Act.[3]
Causation
Commerce argues that even if it is found that it violated some provisions of G.L.c. 176D the plaintiff may not recover since any such violations were not causative of any injuries sustained by the plaintiff. In this regard Commerce alleges that the predicate to plaintiffs recovery, that being a written demand notice sent under Mass. G.L.c. 93A was deficient. Additionally, Commerce claims that Pierre’s own unreasonableness and disinclination to settle his claim upon reasonable terms and for a reasonable amount precludes recovery under c. 176D/93A. This Court disagrees with Commerce’s position on these points for the following reasons.
a. The 93A Demand Letter Issue
On May 28, 2003 counsel for Sterlin served upon Commerce, by certified mail, a written demand for relief pursuant to G.L.c. 93Aand 176D. Therein, Pierre contended that Commerce had violated these statutes by improperly paying medical payments benefits directly to UMass Medical, instead as had been directed, to him. Moreover, Commerce had failed to conduct a “prompt, independent and reasonable investigation” of his claims. Pierre’s demand letter went on to state that “under even the most generous calculation, at least 92 days‘has elapsed since Commerce has been apprised of the claim without an independent determination as to liability. Liability in this case is clear, Mr. Patel was cited for marked lanes violation (89-4A) and criminally charged with operating to endanger (90-24) with no notation of any involvement of alcohol ingested. In fact, it was your insured that called the police, stated that he fell asleep while driving, crashed into the Sterlin vehicle, and caused it to flip over.” Pierre made various demands for relief, including the payment of the policy limits of $505,000 ($500,000 liability benefits and $5,000 medical payments benefits) or, in the alternative, the payment of the $5,000 in medical payments benefits, an advance of $30,000 against his bodily injury claim and the remaining $470,000 “to be paid into Court under a declaratory action to determine the apportionment of damages between [sic] the three claimants.” With this demand counsel for Pierre enclosed additional medical records and additional medical bills, which brought Pierre’s total of medical bills incurred to over $83,000. Pierre’s tax returns for 2001 and 2002, as well as the police report of the incident in which it states that Sagar fell asleep while operating his motor vehicle were also enclosed.
The next day on May 29, 2003 counsel for the plaintiff Pierre sent Commerce additional medical record updates of his ongoing treatment.
Commerce responded by denying plaintiffs allegations, by rejecting the demands for settlement as Commerce had “a differing version of the facts of the accident from our insured” and that Commerce had been “reasonable and fair in handling of your client’s claim . . . [and had] conducted a reasonable investigation, [and thus] we see no violation under c. 93A and 176D.”
In plaintiffs amended demand letter dated July 3, 2003 he asserts the additional claim that Commerce had violated Mass. G.L.c. 176D, §3(9)(f) in its failure to make a “prompt offer of a fair and equitable settlement once liability has been reasonably clear.” In this demand letter, Pierre reiterated his demand for the payment of the bodily liability limits of $500,000 to settle his claim. To this letter Commerce responded by stating that “based upon our investigation to date, it is our opinion that liability has not become reasonably clear in this matter. Therefore, we are unable to present a settlement offer to your client.” Accordingly, no offer of settlement was tendered.
Commerce argued at trial and in its memoranda on the issue that Sterlin had failed to present an adequate demand letter as required by G.L.c. 93A for the following reasons: First, Commerce alleged that by not stating therein that it would provide a release of Commerce’s insureds, Sagar and Mukesh Patel, that the demand letters were in effect, demands made pursuant to the decision of Thaler v. The American Insurance Company, 34 Mass.App.Ct. 639 (1993), which had been expressly overruled by the Supreme Judicial Court in Lazaris v. Metropolitan Property & Casualty Insurance Company, 428 Mass. 502, 504 (1998). Commerce argued that Lazaris held that an insurer’s obligation to make an offer of settlement when liability is reasonably clear requires a full settlement involving the “release or termination of further claims against the tortfeasor.” Lazaris, 428 Mass. at 505. There is nothing however in Pierre’s demand letters that indicates that he would not provide a release upon the payment of settlement funds nor is there any requirement in either G.L.c. 176D or G.L.c. 93A that a claimant set this forth in his demand letter. Likewise there is nothing prohibiting Commerce from making a reasonable offer of settlement in response to such a demand letter in which a release of its insured, as is required by Lazaris, is a condition. Commerce did not do this. In fact Commerce made no offer of settlement and did not raise this issue in either of its responses. It is late in the day to now state that it would have made a reasonable offer of settlement if plaintiff had been clear in its demand that he would provide a release upon payment. I reject this argument by Commerce.
b. The Issue of Plaintiffs Settlement Demands
Commerce also claims that its failure to present a reasonable offer of settlement to Pierre is not causative of any damages sustained by him since, it was clear from his demand for the entire policy limits to be paid to himself only, and statements attributed to him in conversations with his counsel and at Pierre’s oral *131 deposition, that plaintiff was not inclined to accept a reasonable offer of settlement at that time. Commerce buttresses this argument by pointing to the fact that after its offer of settlement was made on December 11, 2003 and it agreed to pay over the entire liability benefits of $500,000 to the three claimants, agreement by the claimants as to the disposition of these funds was not achieved until September of 2004.
The after-the-fact view, which Commerce wishes this Court to take of plaintiffs actions also reveals that in fact Pierre did accept $275,000 in settlement of his claim. Whether or not it was inevitable that the three claimants (i.e. Sterlin, Rose and Sers Sterlin) would dispute the division of the settlement proceeds, this Court finds it reasonable to conclude that had Commerce paid over the liability benefit limits at an earlier date, the distribution process would have started and have been completed at a date earlier than September 2004.
Additionally, Commerce’s position that Pierre was adamant on receiving the entire $500,000 benefits for himself, putting Commerce in the position that Lazaris addressed where it would be inviting lawsuits upon itself[4] is disingenuous since Pierre stated for the record in his demand letter of May 28, 2003 that he was agreeable to the payment over of substantially all of the bodily liability benefits at that time to be divided among the three claimants by agreement or court action.
Although Lazaris does distinguish between “payment” and the “settlement” of a claim, and recognizes that an insured meets its responsibilities under G.L.c. 176D, §3(9)(f) only by effectuating “prompt, fair, and equitable settlements of claims in which liability has become reasonably clear” (emphasis added), Lazaris, 428 Mass. at 504-06, Commerce fails to appreciate the instruction of Lazaris:
Where, however, liability is reasonably clear in an amount substantially above the policy limit the insurance company cannot effectuate a settlement that would be fair and equitable because payment of the policy limit in exchange for a release would not be fair and equitable, as it would not fully compensate the claimant for the damages sustained. Yet the best that the insurance company can do in effectuating settlement is to offer the policy limit in exchange for a release. As we have said, to pay without a release is not a settlement. The claimant can either accept the offer or proceed to trial.
Lazaris, 428 Mass. at 505 (emphasis added).
Again, Commerce’s staunch resistance to making any offer of settlement to the demands of Pierre set forth in the letters of May 28, 2003 and July 3, 2003 are violative of the provisions of G.L.c. 176D and c. 93A. See Clegg v. Butler, 424 Mass. 413, 420-23 (1997); DiMarzo v. American Mutual Insurance Co., 389 Mass 85, 100-02 (1983); Tallent v. Liberty Mutual Insurance Co., 19 Mass. L. Rptr. 460 (Mass.Super. 2005).
Damages
As stated above, Commerce made an offer of settlement on December 11, 2003 of the entire bodily injury liability benefits of $500,000 to be divided among the three claimants as they determined. In doing so Commerce, in essence, adopted the oral proposal of Attorney Michael Brown on behalf of the claimants Sers and Rose Sterlin and of the plaintiff in his alternative proposal of his demand letter of May 28, 2003.1 find and rule that Commerce failed to make a reasonable offer of settlement when liability was reasonably clear as of July 3, 2003. Prior to this date, counsel for Pierre was still providing medical records and medical bills to Commerce relative to Pierre’s ongoing treatment. With his demand letter of May 28, 2003, counsel for Pierre enclosed a substantial amount of materials including medical records and followed this with additional records being sent the next day. In the context of claims pursued under G.L.c. 176B, “liability" encompasses both fault and damages. Clegg v. Butler, 424 Mass. 413, 421 (1997); Van Dyke v. St Paul Fire & Marine Ins. Co., 388 Mass. 671, 677 (1983); DeMeo v. State Farm Mut. Auto Ins. Co., 38 Mass.App.Ct. 955, 957 (1995). Ifind and rule that under the objective test as required by our case law, Van Dyke v. St Paul Fire & Marine Ins. Co., 388 Mass. 671, 677 n.8 (1983), DeMeo v. State Farm Mut. Auto Ins. Co., 38 Mass.App.Ct. 955 (1995), a reasonable person, with knowledge of “the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintifF by July 3, 2003, the date of Pierre’s amended demand notice. DeMeo, 38 Mass.App.Ct. 955 (1995). Prior to that date in May and June, certainly on May 28 and May 29, 2003 the plaintiff was still providing medical records and materials to Commerce. Although Commerce, at that time, had an almost complete understanding of Pierre’s injuries but was not yet ready to admit to Sagar’s fault, it is reasonable to provide Commerce with approximately a month to review and analyze the additional medical records and materials received in late May.
Unjust delay in reaching a settlement subjects a claimant to costs and frustrations that are encountered when litigation must be instituted. “Moreover, when an insurer wrongfully withholds funds from a claimant, it is depriving that claimant of the use of those funds.” Clegg v. Butler, 424 Mass. 413, 419 (1997). A claimant’s loss of use of money that should have been obtained through settlement constitutes “actual damages” under M.G.L.c. 93A, §9(3), and, is applicable in this case. See Shwartz v. Rose, 418 Mass. 481, 47 (1994). Pierre lost the use of the settlement funds for the period of July 3 through December 11, 2003, a period of five months. I find that it matters not that agreement among he, Rose and Sers Sterlin was not achieved for eight months following the December *132 11, 2003, offer by Commerce. It is reasonable to believe that had Commerce made its offer of settlement four to five months earlier by July 2003 agreement could have been achieved by the three claimants that much earlier. This court finds and rules that the interest rate on the lost funds during the period of July 3 through December 11, 2003 was that which could have been achieved through low-risk, conservative investments during this period of five (5%) percent. See, Bertassi v. Allstate Ins. Co., 402 Mass. 366, 373 (1988) (“damages under G.L.c. 93A, §9(3) consist of interest at a fair rate [on the settlement amount]”). The loss to Pierre, therefore, for his settlement being withheld five months equals $5,733.75.
Pierre seeks also damages for the loss of an alleged $4,855 for his payment of loan origination fees and interest through December 11, 2003. This arises out of his need to borrow funds “against the lawsuit,” during the summer of 2003. Although Pierre testified to seeking and receiving such a loan and incurring such costs, this was not supported by any other evidence. As such, I find that he has failed to prove this amount as a damage. Lastly, it is for this court to decide whether any damages that have been incurred by Pierre as a result of Commerce’s violation of G.L c. 176D should be doubled or trebled under M.G.L.c. 93A, §9. Actual damages suffered by a claimant such as the loss of the use of money is subject to multiplication under the statute if it is found that Commerce’s unfair settlement claims practices, i.e. “unfair or deceptive acts or practices,” were wilful or knowing or that Commerce’s refusal to grant relief upon demand was made in bad faith with reason to know that the practice complained of violated G.L.c. 93A, §§2 and 9(3).
I find that Commerce had more than enough notice that its handling of the claim of Pierre was improper. Certainly Gago had evidence at her disposal to different facts than she continuously set forth in the Commerce files. Even after learning of the admission of fault by Sagar in the criminal trial, Commerce clung to the idea that it could still attribute some of the fault to Sers Sterlin despite a complete absence of any evidence that he was at fault. I find therefore that Commerce’s response to the settlement demand of July 3 and its failure to make any proposal for settlement at that time, when liability was reasonably certain, was made wilfully or knowingly and in bad faith. See Heller v. Silver Branch Construction Corp., 376 Mass. 621 (1978). Accordingly, I find that the correct remedy is an award of treble damages under G.L.c. 93A, §9(3).
Accordingly, this court awards the plaintiff Pierre Sterlin the amount of $17,201.25 in damages plus reasonable attorneys fees and costs incurred in prosecuting this c. 93A action.
ORDER
(1) For the reasons set forth above, this Court finds that Commerce Insurance Company did violate its duty as a liability insurer under G.L.c. 176D, §3(9)(f) “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.”
(2) This Court finds that the violations set forth above were wilful or knowing violations of G.L.c. 93A and that trebling the amount of actual damages is an appropriate award for such violation. Therefore, the Court AWARDS the plaintiff, Pierre Sterlin, the amount of $17,201.25 in actual and punitive damages.
(3) This Court finds, under G.L.c. 93A, §9(4), that Commerce Insurance Company shall also pay to the plaintiff Pierre Sterlin the reasonable attorneys fees and costs incurred in prosecuting this action. Plaintiff shall serve his application for reasonable attorneys fees and costs, supported by appropriate affidavits and documentation, no later than twenty (20) days from the date of this decision. The defendant Commerce, no later than ten (10) days following the filing by plaintiff of the application, shall serve any opposition thereto. A hearing regarding the application for attorneys fees shall be scheduled thereafter.

 The “Crash Narrative” given by Sagar Patel on his Crash Report rendered 2 days before his telephone interview states: “I was traveling in the right most lane on the Massachusetts Turnpike westbound below the speed limit. Then I noticed a motor vehicle in the far left lane hit the median barrier. I pulled over to the right break down lane and called 911.”

 Emails of Robert Marchewka and James Rohr dated May 23 and 28, 2003 respectively questioned the performance so far of the investigation as well as Sagar’s statement as to how the accident happened.

 By seeking a release of itself upon the payment of its insured’s benefits to the claimants, Commerce was in effect seeking to have the insurance coverage afforded to its insured, Mukesh Patel, cover its own liability to plaintiff for any statutoryviolations. Although the statute does not specifically define such actions as unfair claim settlement practices, it does set forth in §3(9)(m) that it is a violation and an unfair claims settlement practice by “failing to settle claims promptly . . . under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.” In a like manner, this court believes that an insurer’s attempt to settle its own claims against itself by the payment of its insured’s liability benefits is likewise a violation of the statute and an unfair or deceptive act or practice under G.L.c. 93A.

“If we read §3(9) (f) as requiring payment of the policy limit without a settlement of claims against the insured, then an insurance company would be forced to watch both flanks. On one side, the company may be sued for unfair settlement practices by a claimant disgruntled by the company’s failing to pay, and on the other side, the company may be sued by an insured disgruntled by the company’s payment of the policy limit without obtaining a release. We do not construe G.L.c. 176D, §3(9)(f) to place insurers in such a position.” Lazaris, 428 Mass. at 506.